IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE  DISTRICT OF FLORIDA
JACKSONVILLE  DIVISION

| | |
|---|---|
| CITY OF APALCHICOLA, FLORIDA, | ) |
| | ) |
| Plaintiff, | ) |
| | )CIVIL NO. |
| | 3:08CV233-J-PAM-JRK |
| vs. | ) |
| | ) |
| THE UNITED STATES ARMY CORPS OF | ) |
| ENGINEERS; PRESTON M. GEREN, ACTING | ) |
| SECRETARY, UNITED STATES ARMY, JOHN | ) |
| PAUL WOODLEY, JR., ASSITANT SECRETARY, | ) |
| UNITED STATES ARMY, LT. GEN. ROBERT L. | ) |
| VAN ANTWERP, COMMANDER, U.S. ARMY CORPS | ) |
| OF ENGINEERS, BRIG.GEN. JOSEPH SCHROEDEL, | ) |
| COMMANDER SOUTH ATLANTIC DIVISION, U.S. | ) |
| ARMY CORPS OF ENGINEERS, COL. BYRON JORNS, | ) |
| COMMANDER MOBILE DISTRICT, U.S. ARMY | ) |
| CORPS OF ENGINEERS, | ) |
| | ) |
| Defendants. | ) |

_____

## AMENDED COMPLAINT

Plaintiff, City of Apalachicola, Florida, files this Amended Complaint against the

Defendant, United States Army Corps of Engineers ("Corps") and the officers and

officials named herein in their official capacities and alleges:

### I. JURISDICTION AND VENUE

1.      This Court has jurisdiction in this action pursuant to 5 U.S.C. §701 *et seq.;*

28 U.S.C. §§ 1331, 1346 and 1361;  28 U.S.C. 2201 and § 2202.

2.      Venue is vested in the Northern District of Florida under 28 U.S.C. 1391(e) because a substantial part of the events, acts or omissions giving rise to the City of Apalachicola's claims occurred in this district; the Woodruff Dam operated and regulated by the Defendant Corps is located partially in Florida in this district as is Apalachicola Bay and the entire run of the Apalachicola River.  The Defendant Corps has offices located in this district.

## II.  NATURE OF ACTION

3.      This is an action for declaratory and injunctive relief brought, in part, under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq., and 28 U.S.C. §* 1361 with respect to final agency actions of the Defendants in their official capacities as officers or officials of the Untied States Army or the Corps, who are responsible for operations of dams, reservoirs and related facilities in the Apalachicola-Chattahoochee-Flint ("ACF") Rivers, together with their respective tributaries and hydrologically-connected underground water ("ACF System").  City of Apalachicola, Florida alleges violations of various laws governing the Corps' actions in operating in the ACF System including: The Rivers and Harbors Act, July 24, 1946, Pub. L. No. 525, ch. 595;  the Water Supply Act of 1958, Pub. L. No. 85-500, Title III;  the Flood Control Act of 1944, 33 U.S.C. §§ 708, 709;  various published and unpublished Corps regulations governing the Corps' operations in the ACF System;  the  Water Resources Development Acts of 1988 and 1990, 33 U.S.C. §§ 2312, 2319;  the National Environmental Policy Act ("NEPA"), 42 U.S.C. §4321, *et seq.*; and Section 307 of the Coastal Zone Management Act ("CZMA"), 16 U.S.C. § 1456.

### III.  THE PARTIES

4.     The City of Apalachicola, Florida is a municipality of the State of Florida, located in Franklin County, Florida, composed of approximately 3,000 residents and situated on Apalachicola Bay and the Apalachicola River.  The City of Apalachicola has within its City limits and has riparian rights to parts of the Apalachicola Bay and the Apalachicola River.  The City of Apalachicola has historically been and continues to now be dependent upon the Apalachicola Bay ecosystem that produces and reproduces in its natural state, oysters, shrimp, crab and other seafood and finfish for the City of Apalachicola's livelihood, economy, tourism and actual existence.   At least three of Franklin County's (and for that matter Florida's) largest seafood dealers and processors are located and operate within the City limits of Apalachicola, Florida.  The wholesale and retail seafood dealers and harvesters that work or live in the City of Apalachicola provide a significant amount of the economy of the City of Apalachicola and at least one-third of the oysters, shrimp, crab and other seafood and finfish harvested in Franklin County from Apalachicola Bay.   Since the City of Apalachicola is dependent upon for its existence and identity the harvesters, processors, dealers and associated workers in the seafood business and these are, in turn, dependent upon the existence of the Apalachicola Bay ecosystem with its required minimum flows of freshwater, the City of Apalachicola is itself dependent upon the required flow of fresh water down the Apalachicola River into the Apalachicola Bay to continue the viable existence of this ecosystem organism. It is now a matter of reality that the reductions in flow allowed and permitted by the Defendants, particularly those in the last year and certainly the actions allowing the flow to be reduced below 5,000 CFS at the Jim Woodruff Dam, have reduced the arterial flow

down the Apalachicola River to the point that the organism naturally created to receive this flow (Apalachicola Bay) has been catastrophically damaged. Four of the largest oysters bars in Apalachicola Bay have been reported as now dead (December 2007) due to the lack of the fresh water flow down the Apalachicola River into the Apalachicola Bay.  This natural and national treasure known as the Apalachicola Bay ecosystem is an organism that depends upon a certain minimum level of fresh water flow per day from the Apalachicola River to exist and produce the prolific amounts of marine life necessary to the existence and identify of the City of Apalachicola, Florida.

5.      Defendant Corps is a branch of the United States Army, and is responsible for operating and maintaining all federally owned and operated dams and reservoirs in the ACF System.

6.      Defendant Pete Geren, the Acting Secretary of the Army, has overall responsibility for the Corps. He may be served at the Department of the Army, 101 Army Pentagon, Washington, D.C. 20110-0101.

7.      Defendant John Paul Woodley, Jr., is the Assistant Secretary of the Army (Civil Works), and is directly responsible for the activities of the Corps, including those in the ACF System.  He may be served at the Department of the Army, 108 Army Pentagon, Washington, D.C. 20310-0108.

8.      Defendant, Lieutenant General Robert L. Van Antwerp is the Chief of Engineers and Commander of the Corps who oversees and directs the activities of the Corps, including those in the ACF System.  He may be served at the United States Army Corps of Engineers, 441 G Street, N.W. Washington, D.C.  20314-1000.

9.      Defendant Brigadier General Joseph Schroedel is the Corps' South Atlantic Division Commander, who oversees and directs the activities of the Corps in the South Atlantic Division, which includes the ACF System.  He may be served at U.S. Army Corps of Engineers, SAD, 60 Forsythe Street, SW, Room 9M15, Atlanta, Georgia 30303-8801.

10.      Defendant Colonel Peter Taylor is the Commander and District Engineer for the Corps' Mobile Engineer District, and oversees and directs the activities of the Corps in the Mobile Engineer District, including those in the ACF System.  He may be served at U.S. Army Corps of Engineers, 190 Saint Joseph Street, Mobile, Alabama 36602-3630.

11.      Congress provided in  33 U.S.C. § 701b that  federal investigations and improvements of rivers and other waterways for flood control and allied purposes shall be under the jurisdiction of and shall be prosecuted by the Department of the Army under the direction of the Secretary of the Army and under the supervision of the Chief of Engineers, except as Congress otherwise provides.

## IV. FACTUAL  BACKGROUND

12.      The Chattahoochee River originates in the mountains of northern Georgia, flows southward to become part of the border between Georgia and Alabama, and joins the Flint River to become the Apalachicola River, which flows south across the panhandle region of Florida into the Apalachicola Bay at Apalachicola, Florida.  The flows of the Chattahoochee, Flint and Apalachicola Rivers, together with their respective tributaries and hydrologically-connected underground water, make up the ACF System. The land areas drained by the System constitute the ACF Basin. (See Exhibit A).

13.     The Apalachicola River and ACF Basin form an ecosystem of unparalleled richness and diversity.  The organism that was created to receive the natural flow of fresh water from the Apalachicola as a requirement for its existence and its abundant production is the Apalachicola Bay ecosystem.

14.     Because of its uniqueness, numerous designations have occurred to note the importance of and help protect the Apalachicola system.  Not only have state and federal agencies been involved, but local participation has also been a key ingredient.  In 1969, the State of Florida designated Apalachicola Bay one of eighteen Aquatic Preserves.  In 1979, the lower river and bay system was designated as a National Estuarine Research Reserve by the National Oceanic and Atmospheric Administration (NOAA).  The Bay is also designated as Outstanding Florida Water.  The State of Florida designated the lower Apalachicola River an Outstanding Florida Water in 1979 and included the upper river in 1983.  Thus, the ambient water quality of the river, at the time of designation, is used as the standard which cannot be lowered, instead of allowing degradation to prescribed statewide or nationwide values.  Apalachicola Bay is also designated a Class II Shellfish Harvesting Area, one of the highest standards for water quality in the State of Florida, just behind drinking water standards.

15.     In 1984, the United States Education, Scientific, and Cultural Organization (UNESCO) designated the Reserve a Biosphere Reserve under the International Man and the Biosphere (MAB) Program.  In 1985, The State of Florida declared Franklin County, including the City of Apalachicola, as an Area of Critical State Concern due to the developmental pressures being exerted in order to help protect the Apalachicola Bay ecosystem.  The City of Apalachicola continues to be an Area of Critical State Concern.

All of these designations, from state, national and international agencies recognize the Apalachicola River and Bay system as a unique and environmentally sensitive resource which deserves protection and preservation.

16. Commercially, the American oyster is the most important invertebrate in the estuary. Approximately 90 percent of the oysters harvested in Florida come from Apalachicola Bay. Historically, revenue from this industry has accounted for nearly half of Franklin County's income (Whitfield and Beaumariage, 1977). Because of relatively mild temperatures in the area, oyster growth is continuous throughout the year and has been estimated to be among the fastest in the United States. Harvestable oysters, those larger than 3 inches, have been produced from spat in as little as 39 weeks. The spawning season is also one of the longest in the United States (Ingle and Dawson, 1952). Apalachicola Bay produces 10 percent of the nations' oysters. The oystermen earn $3 million to $4 million a year on average and nearly 900 fishermen hold licenses to harvest oysters commercially.

17. There are 7,000 acres of beds in the 210 square miles of the Apalachicola Bay dedicated to oyster harvesting. In Florida, it is by far the most productive estuarine system and a Florida aquaculture official has stated that it is one of the cleanest and most productive estuaries in North America

18. In 2006 Franklin County reported oyster catches totaling 2,123,585 pounds, finfish catches totaling 1,813,240 pounds, and shrimp totaling 1,272,660 pounds. Harvest of shrimp, crab, fish, and oysters is the driving force in the economy of the City of Apalachicola. The Apalachicola Bay is a major nursery for penaeid shrimp, blue

crabs, and many fish species including striped bass, sturgeon, group, red fish, speckled trout, and flounder.

19.     It is estimated that the total commercial fishing industry in the Apalachicola Bay is responsible for $155,924,000 in local economic output and an additional $71,000,000 in value added impacts producing a total of almost 2000 jobs. This translates to about 11% of the total retail sales in the surrounding counties (Calhoun – 1%; Gadsden – 1%; Gulf – 57%; Franklin – 78%; Jackson - .5%; Liberty - 8%). This analysis does not include ecosystem services. The impact to Florida if the oyster industry in Apalachicola Bay were lost would be about $30,000,000 a year and it would devastate the City of Apalachicola both environmentally and economically.

20.     The ecology and bio-diversity of the Apalachicola River and Bay are essential to sustaining the environment and economy of the City of Apalachicola. The local economy depends on the fishery, which has annual seafood landings reaching millions of dollars dockside. The wetlands nutrients of adjacent state and national parks flowing into the Bay renew its oyster beds continually, furnishing some 1,300 families of 3rd and 4th generation oystermen with a way of life that is an integral part of the community they live in.

21.     In terms of flow, the Apalachicola has been the largest river in Florida and provides a natural habitat for many rare, threatened and endangered plant an animal species. Apalachicola Bay supports an excellent recreational and commercial fishery.

22.     Over 180 species of fish have been documented from the river and bay system. These include fresh water, estuarine, and salt waster species which utilize the estuary during part or all of their life cycle. There are eight diadromous species, four

endemic species, and seven introduced species that are commonly found throughout the Apalachicola River system.  Among these are the Gulf of Mexico sturgeon, American eel, striped bass, bluestripe shiner, and shoal bass.  Common estuarine and marine species that are of local importance commercially include striped mullet, speckled trout, menhaden, red drum, flounders and sharks.

23.     The Reserve and surrounding drainage basin are also among the most important bird habitats in the southeastern United States.  This area lies on the eastern fringe of the Mississippi flyway, thus historically receiving large numbers of birds from both the Midwest and Atlantic Seaboard during migratory periods.  The list totals more than 300 species with 20 designated as endangered, threatened, or species of special concern by the Florida Game and Fresh Water Fish Commission.  The reduction of fresh water flow down the Apalachicola to Apalachicola Bay has also been observed to have increased the salinity in the area of Apalachicola Bay north of Gorrie Bridge that in turn has destroyed the grasses and vegetation in that area and greatly reduced the number of migrating waterfowl that stop in the Apalachicola Bay areas.

24.     Since 1974 the State of Florida and the City of Apalachicola have been purchasing uplands and wetlands in the Apalachicola River and Bay drainage basin to preserve the existence of this unique and productive system.

25.     During this period approximately 261,928 acres have been purchased and put into public ownership.  Florida has spent over $167 million to purchase this property (more if put in 2007 dollars) utilizing 6 different funding sources including Environmental Endangered Lands (EEL), CARL, Preservation 2000, Florida Forever,

and Save Our Rivers.  This property includes one barrier island, Cape St. George Island and parts of St. George Island, as well as floodplain, marsh, and upland parcels.

26.    In addition, the Nature Conservancy has spent over $29 million to buy property along the Apalachicola River as part of their Preserve and parts of Dog Island to protect it from development.  Several other parcels along the river have been protected either through conservation easements or outright purchases such as by the City of Apalachicola under the Florida Communities Trust Program.  The above does not include purchases by the federal government.  The two main pieces of property owned by federal agencies include the St. Vincent National Wildlife Refuge, a 12,358 acre barrier island, located on the southwestern side of the Apalachicola Bay and the Apalachicola National Forest, a 557,400 acre tract on the eastern side of the lower Apalachicola River.  Much of the national forest property is not within the drainage basin, although it includes 2 miles of riverfront and functions as a wildlife corridor along the floodplain.

27.    Recent survey data from the Florida Department of Agriculture, Shellfish Section, shows the mortality related to reduced inflows is already being observed. Moreover, well established science supports the conclusion that oyster populations will be dramatically reduced in 2008 and 2009 as a result of the low flows from the Apalachicola to Apalachicola Bay today.

28.    In March of 2007 the environmental specialists studying oyster beds in the Apalachicola Bay at the Florida Department of Agriculture and Consumer Services in Apalachicola observed significant oyster mortality events in western Apalachicola Bay. During the summer of 2007, oyster mortality was observed at oyster bars closer to the

mouth of the Apalachicola River.  In October, oyster mortality was determined on Cat Point and Easthole bars in St. George Sound, south of the mouth of the Apalachicola.

29.     It was observed by these environmental specialists that the mortality of oysters in the referenced oyster bars is associated with the reduced fresh water inflows and resulting elevated salinity of Apalachicola Bay.  Mortality was first observed on oyster bars where the Rivers influence is weakest.  As the summer of 2007 progressed, oyster mortality was subsequently found at oyster bars closer to the mouth of the river and as higher salinity conditions continued, mortality on bars observed to spread eastward to St. George Sound.

30.     Dermo disease is a disease that affects oysters the presence and effect of which is increased during periods of higher salinity in Apalachicola Bay.  The prevalence of Dermo parasites was high in  September and October of 2007 due to the lack of fresh water input into Apalachicola Bay.

31.     It has been scientifically determined that without significant inputs of fresh water into Apalachicola Bay, oyster populations and condition of oysters in the Apalachicola Bay will continue to decline and be destroyed.   It is further the determination of the environmental specialists that if river flows remain low or decline (October 2007) then the ecology of Apalachicola Bay will continue to be disrupted and oyster habitat and oyster populations will suffer further destruction.

32.     In November 2007, oystermen who have spent their life on Apalachicola Bay harvesting oysters noted the death of four of the largest oyster bars in Apalachicola Bay.

33.     The City of Apalachicola (and surrounding area) is facing economic peril as a result of insufficient water flows to Apalachicola.  The Apalachicola River and Bay support a multi-million dollar commercial fishing industry.   Recent date documents that this industry is already being jeopardized as a result of reduced inflows.  Continued reductions will only hasten the catastrophic decline of this important component of the City of Apalachicola's economy.  The resulting loss of jobs will devastate a people who have relied on this industry for generations, and in particular those residents of the City of Apalachicola.

34.     In a report published as long ago as 1997 by researchers including H.L. Edmiston, from the Apalachicola National Estuarine Research Reserve, Florida Department of Environmental Protection, Apalachicola, Florida, it was noted:

    a.      The important role that salinity plays in the distribution of flora and fauna has long been recognized by estuarine ecologists.  The role salinity plays in spawning, settling and survival of sessile benthic organisms such as oysters in Apalachicola Bay has been documented extensively (Ingle, 1951; Ingle & Dawson, 1951, 1953; Menzel et al., 1957, 1966).

    b.      With the increasing diversion of upstream water resources for agricultural, municipal, industrial and recreational uses many estuarine environments have already been altered, and many more are in the process of being altered by decreasing freshwater input.

35.     A recent letter from the Board of County Commissioners of  Franklin County, (which county surrounds Apalachicola Bay), stated:  "The Bay will cease to be that perfect blend of fresh water and salt water feeding many stages of aquatic life that form the basis of this economy.   We are currently observing oyster mortality in significant numbers.  We have had a very limited shrimp and crab harvest for the last two years.  In short, the oysters, shrimp, crabs, and most of the sport fish normally found in great quantities in the Bay are being critically impacted by the loss of fresh water.

Without the bounty of the Bay, this part of Florida and the lifestyles and livelihoods found here, will simply disappear."

36.     One of the largest shrimp processors and producers in the State of Florida whose business is located on the Apalachicola River/Bay in Apalachicola noted that the harvest of white shrimp in the Apalachicola Bay area that had been produced at his location had dropped from over 250,000 pounds in 2006 to none through the fall of 2007. This was attributed to the reduced flows of the Apalachicola by the Defendants causing significant increases in salinity.

37.     The service also noted that the Apalachicola Basin is renowned for its unique biota that results from its continuity with the Southern Appalachians and its diverse physical environments. Apalachicola Bay also is an important contributor to the health and continued sustainability of the Gulf of Mexico. As much as 95% of all species harvested commercially and 85% of all species harvested recreationally in the Gulf of Mexico spend a portion of their life cycle in an estuary such as Apalachicola Bay.

38.     In short, this Apalachicola Bay Ecosystem organism requires as its life blood a certain minimum amount of the nutrient rich fresh water flow from the Apalachicola River to allow it to survive and produce. Actual sampling and harvesting efforts have now made it clear that the 5,000 CFS established by the Corps is not sufficient to permit survival of this productive ecosystem and that the reductions by the Corps to 5,000 CFS of river flow of the Apalachicola River at Chattahoochee and now below that amount as allowed by the Corps in November of 2007 have catastrophically and clearly destroyed parts of Apalachicola Bay including but not limited to oyster bars

and shellfish habitat  and some parts of the spawning and growth cycle estuaries of the shrimp, crabs and seafood of the Apalachicola Bay ecosystem.

39.     The waters of the ACF System are vital to the economy and ecology of the City of Apalachicola and the City of Apalachicola has a duty to its residents and its future generations to protect their interest in maintaining and preserving the Apalachicola Bay Ecosystem and related natural resources from destruction by lack of fresh water flow from the Apalachicola River due to the Corps or any other person, entity or agencies final and unlawful actions.

40.     It is the position of the City of Apalachicola that management of the ACF System should logically start with the determination of the need of the largest and first user of this fresh water flow (Apalachicola Bay) and then move back up to the artery that supplies this flow, to determine the amount of this fresh water flow above that minimal flow that may be used upstream.

41.     The Corps has been authorized by Congress to develop and operate dam and reservoir projects within the ACF System, subject to the requirements of specific statutes and regulations.  Contained within the ACF Basin are several projects with interrelated purposes.  Among these projects are the following:  Buford Dam is located on the Chattahoochee River about 35 miles northeast of Atlanta, Georgia, and impounds Lake Sidney Lanier;  West Point Dam is located on the Chattahoochee River downstream of Atlanta on the boundary between Georgia and Alabama, and impounds West Point Lake; Walter F. George Lock and Dam  are located on the Chattahoochee River along the border between Alabama and Georgia, and impound Walter F. George Lake ("Lake Eufaula");  George W. Andrews Lock and Dam are located on  the Chattahoochee River

directly south of the Walter F. George Lock and Dam, and impound Lake George W. Andrews on the border between Alabama and Georgia;  Jim Woodruff Lock and Dam are located immediately downstream of the confluence of the Chattahoochee and Flint Rivers and impound Lake Seminole on the border between Georgia and Florida, which releases water into the Apalachicola River.

## V. STATUTORY AND REGULATORY REQUIREMENTS

### A.  The Administrative Procedure Act

42.    Judicial review of the Defendants' final agency actions in operating federally owned dams, reservoirs, and related facilities in the ACF System may be obtained under the judicial review provisions of the APA, at 5 U.S.C. § 551, *et seq.* "Agency action" under the APA includes the "whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13). Final agency action that is reviewable pursuant to 5 U.S.C. § 551(13).  Final agency action is reviewable pursuant to 5 U.S.C. § 704 "includes any effective or operative agency actions for which there is no other adequate remedy in any court." Report of the House Committee on the Judiciary, S. Doc. No. 248, 79th Cong. 2d Sess. 277 (July 26, 1046).  All of the actions of which the City of Apalachicola complains are "final agency actions."

43.    Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

44.    The APA provides that a reviewing court shall:

> (1)    Compel agency action unlawfully withheld or unreasonably delayed;  and

(2)     Hold unlawful and set aside agency action, findings, and
conclusions found to be – (A) arbitrary, capricious, and abuse
of discretion, or otherwise not in accordance with law;  . . .
(C) in excess of statutory jurisdiction authority or limitations ,
or short of statutory right;  (D) without observance of procedure
required by law . . .

5 U.S.C. § 706.

## B. Defendants' Obligations Governing Operation of ACF Facilities

45.     Defendants' actions in operating the federally owned dams, reservoirs and

related facilities in the ACF system are subject to the mandatory requirements and

restrictions of federal statutes and regulations. These include the authorizing legislation

for  Buford Dam and Lake Lanier, the Water Supply Act of 1958, the Flood Control Act

of 1944, the Water Resources Development Acts of 1988 and 1990, NEPA, the CZMA,

the ESA and numerous published and unpublished regulations discussed below.

### Duty to Operate In Accordance With Authorized Purposes

46.     In 1946, Congress authorized the Corps to develop Buford Dam and Lake

Lanier. Pub.L. No 525 ch. 595 (July 24, 1946).  Congress statutorily defined the purposes

for which Lake Lanier must be operated to include only  flood control, navigation and

hydropower. (Emphasis added)  *See e.g.,* U.S. Army Corps of Engineers, *Apalachicola*

*River Basin Reservoir Regulation Manual, Appendix B, Buford Reservoir, Chattahoochee*

*River, Georgia* (Dec. 1959), at B-6.  Consistent with the scope of the Congressionally-

authorized purposes,  the Corps must operate Lake Lanier for the purposes authorized by

Congress.

47.     By letter dated April 15, 2002, to Governor Roy E. Barnes of Georgia, the

Acting Secretary of the Army properly denied Georgia's request to the Corps for

increased water storage in Lake Lanier and contracts for municipal and industrial water supply (the "2002 Denial").  The quantity of storage would have equaled approximately 34% of the conservation storage in Lake Lanier.  According to Georgia, the request represented a mere continuation of the manner in which the Corps already was operating Lake Lanier. The 2002 Denial was based upon the legal conclusion that Georgia's request could not be granted without additional authorization.

48.     The 2002 Denial enclosed, as "an explanation of the Army's legal position in this matter," an April 15, 2002 opinion prepared by the Office of the Army General counsel and signed by Earl Stockdale, Deputy General Counsel (Civil Works & Environment) (The "Stockdale Opinion").   The Stockdale Opinion sets forth the Defendants' interpretation of legal principles and requirements that apply to Defendants' decisions and actions concerning the Corps' operation of the Lake Lanier project.

49.     As admitted and explained in the Stockdale Opinion, Defendants do not have authority to make material changes in project operations or substantially alter the balance of project purposes at Lake Lanier without Congressional action authorizing them.  Specifically, Defendants have no authority to make project changes that materially alter the nature of the project, such as the deletion or addition of project purposes where not otherwise authorized by law, or substantial changes in the relative sizes of project purposes.

50.     Congress provided in the Flood Control Act of 1944, 33 U.S.C. §709:

> On and after December 22, 1944, it shall be the duty of the Secretary of the Army to prescribe regulations for the use of storage allocated for <u>flood control</u> or <u>navigation</u> at all reservoirs constructed wholly or in part with Federal funds provided on the basis of such purposes, and the operation of any such project shall be in accordance with such regulations . . . .  (Emphasis added)

51.     The Corps promulgated 33 C.F.R. § 222.5 which "prescribes policies and procedures to be followed by the U.S. Army Corps of Engineers in carrying out water control management activities, including establishment of water control plans for Corps and non-Corps projects, as required by Federal laws and directives."   33 C.F.R. § 222.5(a).   This set of regulations applies to "all field operating activities having civil works responsibilities,"   33 C.F.R. § 222.5(b), including the Corps' projects on the ACF System identified above. 33 C.R.R. §222.5(o) & App. E, South Atlantic Div.

52.     The Corps must prepare a "water control plan" for reservoirs, locks and dams reregulation and major control structures and interrelated systems to conform with objectives and specific provisions of authorizing legislation and applicable Corps of Engineers reports." 33 C.F.R. § 222.5(f)(1).   "Water control plans include coordinated regulation schedules for project/system regulation and such additional provisions as may be   required to collect, analyze and disseminate basic data, prepare detailed   operating instructions, assure project safety and carry out regulation of projects in an appropriate manner." 33 C.F.R. § 222.5(e)(1).  Corps regulations provides:

> The term 'reservoir regulation schedule' refers to a compilation of operating criteria, guidelines, rule curves and specifications that govern basically the storage and release functions of a reservoir.  In general, schedules indicate limiting rates of reservoir releases required during various seasons of the year to meet all functional objectives of the particular project, acting separately or in combination with other projects in a system.

53.     The Corps regulations provide:   "There cannot be a continuing or recurring deviation from approved water control plans. In the case of a continuing or recurring change, the water control plan must be changed and the required approval

obtained from HQUSACE." ¶ 18-2(f) of the Corps' engineer pamphlet EP 1165-2-1 (at 18-4) (July 30, 1999).

54.     The Corps must develop water control plans "in concert with all basin interests which are or could be impacted by or have an influence on project regulation. Close coordination will be maintained with all appropriate international, Federal, State, regional and local agencies in the development and execution of water control plans." 33 C.F.R. § 222.5 (f)(9); *see also* EM 1110-2-3600 at 2-1 (Nov. 30, 1987).  However, the destruction of Apalachicola Bay and consequently the City of Apalachicola and its residents has obviously not been considered nor given its primary interest in determining the river flow restrictions.

55.     Water control plans must be "clearly documented in appropriate water control manuals."  33 C.F.R. § 222.5(f)(3).  The Corps must prepare a "water control manual" for all reservoirs under its supervision regardless of the purpose or size of the project, and for all lock and dam, re-regulation and major control structure projects that are physically regulated by the Corps. 33 C.F.R. § 222.5(i)(2).  A "water control manual" refers to manuals that relate primarily to the functional regulation of an individual project or system of projects."  33 C.F.R. § 222.5(i)(1).  Each water control manual must contain "a section on special regulations to be conducted during emergency situations, including droughts."  33 C.F.R. § 222.5(i)(5.).  (Emphasis added). The regulations further provide that

> Water control plans … documented in … water control manuals … will be revised as necessary to conform with changing requirements resulting from developments in the project area and downstream, improvements in technology, new legislation and other relevant factors, provided such revisions comply with existing Federal regulations and established Corps of Engineers policy.

33 C.F.R. § 222.5(f)(3).

56.     Where there are several projects in a drainage basin with interrelated purposes, a "Master Manual" must be prepared.   33 C.F.R.  § 222.5(i)(2).   Corps requirements further provide that "[n]ormally, the control of a multiproject system requires an integrated water control plan whereby projects are regulated jointly in order to achieve the overall river basin management objectives.  In such cases as master water control manual is prepared to define system regulation."  EM 1110-2-3600 at 2-3 (Nov. 30, 1987).  The Corps projects on the ACF System have been interrelated purposes.

### Restrictions on Reallocation of Water Storage

57.     Congress declared in 43 U.S.C. § 390(b)(d), enacted as part of  the Waster Supply Act of 1958, § 301(d):

> Modifications of a reservoir project heretofore authorized, surveyed, planned, or constructed to include storage as provided in subsection (b) of this section [for municipal and industrial purposes] which would seriously affect the purposes for which the project was authorized, surveyed, planned or constructed, or which would involve major structural or operational changes shall be made only upon the approval of Congress as now provided by law. (Emphasis added)

58.     Paragraph  3-8(b)(5) of ER 1105-2-100 (at 3-33-34) elaborates on the restrictions on reallocation and addition of storage in a Corps project imposed by 43 U.S.C. § 3906b(d):

> Reallocation of storage.  Reallocation or addition of storage that would seriously affect other authorized purposes or that would involve major structural or operational changes requires Congressional approval.  Provided these criteria are not violated, 15 percent of the total storage capacity allocated to all authorized project purposes or 50,000 acre feet, whichever is less, may be allocated from storage authorized for other purposes.  Or, this amount may be added to the project to serve as storage for municipal and industrial water supply at the discretion of the Commander, USACE.   When reallocating storage from the flood

control pool to municipal and industrial water supply, the need to compensate existing water supply contract holders shall be evaluated.  Dependable yield mitigation storage (DYMS) shall be analyzed and implemented to compensate these users.  Compensation to existing hydropower users through minor operational changes, where appropriate, may also be considered.  Procedures and requirements to analyze and implement DYMS and operational changes are described in Appendix E.

Paragraph E-57 (e) or ER 1105-2-100 (at E-219 et seq.) sets forth the "procedures and requirements for implementation of the DYMS analysis."

59.     Paragraph E-57(d)(1) of ER 1105-2-100 (at E-215-16) establishes the prerequisite for reallocation of storage over and above any requirement of Congressional approval:

Approval Authority.  Reallocation or addition of storage that would have a severe effect on other authorized purposes or that would involve major structural or operational changes requires Congressional approval.  Providing the above criteria are not violated, 15 percent of total storage capacity allocated to all authorized project purposes or 50,000 acre feet,  whichever is less, may be allocated from storage authorized for other purposes or may be added to the project to serve as storage for municipal and industrial water supply at the discretion of the Commander, USACE.  For reallocations up to 499 acre-feet the Commander, USACE has delegated approval authority to the Division commanders.  Reallocations which exceed the Commander's authority may be approved at the discretion of the Secretary of the Army if such reallocations do not require Congressional approval as described above.  All reallocations or additions of storage should be to serve immediate needs.  All reallocations or additions of storage must be accompanied by a report that includes:

(a)  Purpose of the report and Background, including map

(b)  Pertinent project data table

(c)  Water supply needs analysis

(d)  Test of financial feasibility

(e)  Cost of storage analysis

(f)  Analysis of alternatives considered to address the water supply needs

(g)  <u>Appropriate NEPA documentation of environmental impacts</u>
     <u>(Emphasis added)</u>

(h)  Pertinent letters from affected Federal, state and local interests,
     including documentation of public review and comment <u>Opportunities</u>
     <u>for   public review and commitment must be provided.</u>  (Emphasis
     added)

(i)  Commander's recommendation

60.     The Corps also concluded in engineer pamphlet EP 1165-2-1 (July 30,
1999), that Congress must authorize reallocation of storage in an existing project where
the proposed reallocation would severely affect the project.  Paragraph 18-2(a) (at 18-1)
of that document cautioned that modification of existing projects to include storage for
municipal and industrial purposes "which would severely affect the project, its other
purposes, or its operation, requires Congressional authorization."  Again in ¶  18-2(c) (at
18-1-2) of that pamphlet, the Corps declared:  "Reallocation of reservoir storage would
have a significant effect on other authorized purposes or that would involve major
structural or operational changes requires Congressional approval".

61.     Paragraph 17-3(4) of EP 1165-2-1 (at 17-5) provides:

> Reallocation of Reservoir Storage for Recreation.  Many projects,
> including those for which recreation facilities may have been included under
> general provisions of the Flood Control Act of 1944, as amended, do not have
> separate storage costs for recreation.  In these circumstances, recreation  is an
> authorized project purpose but it is secondary, as far as storage operation is
> concerned, to project functions for which the storage was formulated.  Any
> reallocation of reservoir storage to provide more stable recreation levels that
> would have a significant effect on other authorized purposes, or that would
> involve major structural or operational change, requires Congressional
> authorization.  Costs reallocated to recreation will be established as the highest of
> the benefits or revenues foregone, replacement costs, or the updated cost of the
> storage, will be treated as a separable cost, and will be subject to non-Federal cost
> sharing.  (ER 1105-2-100).

### Requirement for Public Involvement and
### Coordination with State and Other Agencies

62.     Congress provided in the Water Resources Development Act of 1988, 33

U.S.C. § 2312:

> Before the Secretary [of the Army] may make changes in the operation of
> any reservoir which will result in or require a reallocation of storage space in such
> reservoir or will significantly affect any project purpose, the Secretary shall
> provider an opportunity for public review and comment.

63.     In a similar vein, Congress mandated in 33 U.S.C. § 2319, enacted as pat

of the Water Resources Development Act of 1990, Pub. L. No. 101-640, 104 Stat. 4604,

4639, Title III, § 310 (b):

> The Secretary [of the Army] shall ensure that, in developing or
> revising reservoir operating manuals of the Corps of Engineers, the Corps
> shall provide significant opportunities for public participation, including
> opportunities for public hearings.  The Secretary shall issue regulations to
> implement this section, including a requirement that all appropriate information
> materials relating to proposed management decisions of the Corps be made
> available to the public sufficiently in advance of public hearings.

64.     The Corps promulgated engineer regulation ER 1105-2-100 (April 22,

2000), superseding ER 1105-2-100 (Dec. 28, 1990)) to provide "the overall direction by

which Corps of Engineers Civil Works projects are formulated, evaluated and selected

for implementation.  It contains a description of the Corps of Engineers planning process,

Corps of Engineers missions and programs, specific policies applicable to each mission

and program, and analytical requirements.  Its fundamental purpose is to describe the

planning process in a straightforward, plain-language manner." *Id*. ¶ 1-2 at 1-1.  This

regulation applies to "all HQUSACE elements, and all USACE commands having Civil

Works responsibilities." *Id*. ¶ 1-3 at 1-1.

65.    The "regulation" provides the requirements for conducting planning studies within the U.S. Army Corps of Engineers Civil Works program."  *Id*. ¶ 1-6 at 1-4. Appendix B to the regulation "provides the requirements for public involvement, collaboration and coordination in Civil Works planning studies."  *Id*. ¶ 1-8 at 1-4.  For example, ¶ B-7 (at B-6) declares that "Division and District commanders shall coordinate civil works planning programs with State and local governments in accordance with Executive Order 12372 (Intergovernmental Review of Federal Programs) and 33 CFR 384 (Intergovernmental Review of the Department of Army Corps of Engineers Program and Activities)."   Paragraph B-7(b)(at B-7) requires that "Division commanders shall adopt such procedures as may be necessary to assure coordination is effected with states in a manner consistent with 33 CFR 384 and the processes established by the individual states."   See also ¶ 3-8(b)(1) of ER 1105-2 (at 3-32)("<u>Potential encroachment on the water rights of lawful downstream water users</u> by the operation of water supply storage <u>must be carefully considered and coordinated </u>with responsible State and <u>local interests</u> … (Emphasis added) Nor should the Corps become involved in resolving conflicts among water users concerning rights to use stored water, but will look to responsible State agencies to resolve such conflicts.").

**Restrictions on the Allowance of Domestic and Industrial Waste Use**

66.    Congress provided in the Flood Control Act of 1944, 33 U.S.C. § 708:

The Secretary of the Army is authorized to make contracts with States, municipalities, private concerns, or individuals, at such prices and on such terms as he may deem reasonable, for domestic and industrial uses for <u>surplus water</u> that may be available at any time under the control of the Department of the Army, <u>that no contracts for such water shall adversely affect then existing lawful uses of such water</u> …  (Emphasis added)

The Corps is prohibited by law from making contracts that are subject to the provisions of 33 U.S.C. § 708 without complying with those provisions.

67.    The Corps, in ¶ E-57(b) or ER 1105-2-100 (at E-214-15),  established the restrictions under which contracts for "surplus water" could be entered:

(1)    Authority.  Under Section 6 of the Flood Control Act of 1944 [33 U.S.C. § 708], the Secretary of the Army is authorized to make agreements for surplus water with states, municipalities, private concerns, or individuals at such prices and on such terms as he may deem reasonable.  These agreements may be for domestic, municipal, and industrial uses, but not for crop irrigation, from surplus water that may be available at any reservoir under the control of the Department of the Army.

(2)    Classification.

(a)    Surplus water will be classified as either:

(1)    water stored in a Department of the Army reservoir that is not required because the authorized use for the water never developed or the need was reduced by changes that occurred since authorization or construction; or

(2)    water that  would be more beneficially used as municipal and industrial water than for the authorized purposes over some specified time period .

(b)    An Army General Counsel opinion on March 13, 1986, states that Section 6 of the Flood Control Act of 1944 empowers the Secretary of the Army to make reasonable reallocations between different project purposes.  Thus, water stored for purposes no longer necessary can be considered surplus.  In addition, the Secretary may use his broad discretionary authority to reduce project outputs, envisioned at the time of authorization  and construction, if it is believed that the municipal and industrial use of that water is a higher and more beneficial use. When the user desires long term use, a permanent storage reallocation should be performed under the authority of the Water Supply Act of 1958, as amended [43 U.S.C. § 3909b].

(3)    Requirements and Restrictions.  Surplus water declarations will only be made when related withdrawals will not significantly affect authorized purposes.  Surplus water agreements shall be accompanied by a brief letter report similar to reallocation reports and shall include how and why the storage is determined to be surplus.  Surplus water agreements will normally be for small amounts of water and/or temporary use as opposed to storage reallocations and permanent right to that storage.  Normally, surplus water agreements will be limited to 5 year periods.  Use of the Section 6 authority should be encouraged

only where non-Federal interests do not want to buy storage because the need of
the water is short term or the use is temporary pending the development of the
authorized use.  The views of the affected  state(s) will be obtained, as
appropriate, prior to entering into any agreement under Section 6 …

*See also* ¶ 3-8(b)(4) or ER 1105-2-100 (at 3-33); ¶ 18-2(d) of EP 1165-2-1 at 18-2-3).

68.     <u>As of 1956</u>, Congress had already determined that there was no surplus

water in Lake Lanier.  See Pub. L. No. 84-841, 70 Stat. 725 (1956); H.R. Rep. No. 84-

2672, at 2 (1956).

### Restrictions on Allowance of Granting Rights to
### Increased Water Withdrawal and Use

69.     In 1992, Florida, Alabama, Georgia and Defendants entered into a

Memorandum of Agreement ("MOA").  The MOA called for a Comprehensive Study of

the ACF and Alabama-Coosa-Tallapoosa River Basins to provide information on water

availability, forecast water needs, examine options for meeting those needs, and find an

appropriate coordination mechanism to implement the Study's findings and

recommendations.

70.     The 1992 MOA included a "live and let live" provision allowing informal

arrangements for water supply withdrawals to proceed as needed while negotiations were

pending.  This portion of the MOA provided the persons currently withdrawing, diverting

or consuming water could continue to do so, and that "any such person may increase the

amount of water resources withdrawn, diverted or consumed to satisfy reasonable

increases in the demand of such person for water during the Comprehensive Study as

permitted by applicable law."  The MOA also provided that "[t]his Agreement shall not

be construed as granting any permanent, vested or perpetual rights to the amounts of

water used during the Comprehensive Study nor shall it be construed as changing the status quo as to the Army's authorization of water withdrawals."

71.     The MOA contemplated that the Comprehensive Study would be completed within three years after a final plan of study as completed.  Although the three States and the Corps originally contemplated that the Comprehensive Study would result in a water sharing agreement among the States, it did not.  Instead, the Comprehensive Study recommended that an interstate compact be developed to apportion the water in the basins.

72.     In 1997, Congress created the ACF Basin Compact among the three States and the United States. Pub. L. 105-104, 111 Stat. 2219. Article VII, Section (c) of the Compact carried forward the "live and let live" provisions of the MOA in virtually intact language.  Specifically, this provision of the Compact states:

> The parties to the Compact further agree that any such person may
>
> increase the amount of water resources withdrawn, diverted or consumed to
>
> satisfy reasonable increases in the demand of such person for water between
>
> the effective date of this Compact and the date on which an allocation formula
>
> is approved by the ACF Basin Commission as permitted by applicable law …

This article shall not be construed as changing the status quo as water used between January 3, 1992 [the date of the MOA] and the date on which the  Commission adopts an allocation formula.

73.     The Comprehensive Study process was truncated before finalization and supplanted by the ACF Basin Compact.  The ACF Basin Compact terminated in August 31, 2003 without the approval of any allocation formula.  Accordingly, the authority for

persons to continue and increase withdrawals, diversions and consumption of water pursuant to the "live and let live" provisions terminated no later than August 31, 2003.

### C.  The Corps' Obligation to Consider the Environmental Impact of Its Operation of Facilities in the ACF System

74.      NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1.

75.      Section 102(2)(C) of NEPA, 42. U.S.C. § 4332(2)(C) requires every Federal agency to consider the environmental impact of any "major Federal actions significantly affecting the quality of the human environment … " "Major Federal action" includes actions with effects that may be major and that are potentially subject to Federal control and responsibility.  40 C.F.R. § 1508.18.

76.      The Council on Environmental Quality ("CEQ") has promulgated NEPA regulations at 40 C.F.R. Parts 1500-1508.  These regulations are "applicable to and binding on all Federal agencies" including the Corps.  40 C.F.R. § 1500.3.  In addition the Corps has promulgated its own regulations implementing NEPA, which are published at 33 C.F.R.  Part 230 (generally applicable to Corps operations) and 33 C.F.R. Part 325, Appendix B (applicable to Corps regulatory programs).  The Corps' NEPA regulations supplement and are intended to be used in conjunction with CEQ's NEPA regulations. 33 C.F.R. § 230.1.

77.      CEQ's regulations require agencies to "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." 40 C.F.R. § 1501.2.

78.     Under the CEQ regulations, a Federal agency is required to prepare an environmental assessment ("EA") of actions not categorically excluded from NEPA compliance, providing sufficient evidence and analysis for determining whether the agency must prepare an environmental impact statement.  *See* 40 C.F.R. § 1508.9(a)(1); 33 C.F.R. § 230.10. Unless the EA results in a finding of no significant impact ("FONSI"), the agency must prepare an environmental impact statement ("EIS").   33 C.F.R. § 230.11.

79.     An EA is a public document which "shall include brief discussions of the need for the proposal, of alternatives as required by Section 102(2)(E), of the environmental impacts of the proposed action and alternatives."  40 C.F.R. § 1508.9. A FONSI is a document "presenting the reasons why an action, not otherwise excluded (§ 1508.4), will not have a significant effect on the human environment."  40 C.F.R. § 1508.13.

80.     When assessing whether an action will have significant environmental impacts, an agency must consider both context and intensity.  40 C.F.R. § 1508.27. In evaluating intensity, the agency should consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts."  40 C.F.R. § 1508.27(b)(7).   "Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment."   40 C.F.R. § 1508.27(b)(7). (Emphasis added) "*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."   40 C.F.R. § 1508.7. "Cumulative impacts can result from individually

minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

81.     According to the Corps: "Actions normally requiring an EIS are: . . . (b) Proposed changes in projects which increase size substantially or add additional purposes; and (c) Proposed major changes in the operation and/or maintenance of completed projects." 33 C.F.R. § 230.6.

82.     As part of the NEPA process for preparation of an EIS, the Corps is required to engage in a process called "scoping." The CEQ regulations require scoping to be "an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action." 40 C.F.R. § 1501.7.

83.     "As soon as practicable" after its decision to prepare an EIS and before the scoping process begins the Corps must publish a notice of intent in the Federal Register. 40 C.F.R. § 1501.7; 33 C.F.R. § 230.12. As part of the scoping process the Corps must invite the participation of affected Federal, State and local agencies and other interested persons, determine the scope and significant issues to be analyzed in depth, and indicate the relationship between the timing of the preparation of environmental analyses and the Corps' tentative planning and decision-making schedule. 40 C.F.R. § 1501.7(a). The Corps regulations further provide that during the scoping process, "public concerns on issues, studies needed, alternatives to be examined, procedures and other related matters will be addressed during scoping." 33 C.F.R. § 230.12. Pursuant to CEQ and Corps regulations implementing NEPA, the Corps may not predetermine its preferred alternative prior to the scoping process, in part, because such predetermination unlawfully precludes the required evaluation of alternatives to a proposed action.

84.     Agencies shall commence preparation of an EIS "as close as possible to the time the agency is developing or is presented with a proposal."  40 C.F.R. § 1502.5. CEQ regulations require that an EIS "shall be prepared early enough so that it can serve practically as an important contribution to the decision-making process and will not be used to rationalize or justify decisions already made."  40 C.F.R. § 1502.5.

85.     Section 102(2)(E) of NEPA, 42 U.S.C. § 4332(2)(E), also requires a Federal agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  *See also* 40 C.F.R. § 1501.2(c).

86.     Until an agency completes its NEPA process and issues a record of decision, "no action . . . shall be taken which would: (1) Have an adverse environmental impact; or (2) Limit the choice of reasonable alternatives."  40 C.F.R. § 1506.1(a); 33 C.F.R. § 230.22.

87. Congress declared in 33 U.S.C. § 2316, enacted as part of the Water Resources Development Act of 1990, Pub. L. No. 101-640, 104 Stat. 4604, 4635, Title III, § 306:

(a) General rule

The Secretary [of the Army] shall include environmental protection as one of the primary missions of the Corps of Engineers in planning, designing, constructing, operating, and maintaining water resources projects. (Emphasis added)

88.     The published and unpublished regulations cited in this Complaint bind Defendant.

### D.  The Corps' Obligations to Provide a Consistency Determination and to Act Consistently with Florida's Management Plan

89.     The CZMA is the national policy "to preserve, protect, develop, and where possible, to restore or enhance, the resources of the Nation's coastal zone for this and succeeding generations." 16 U.S.C. § 1452(1).

90.      In enacting the CZMA, Congress acknowledged that the "<u>coastal zone</u>, and the fish, <u>shellfish</u>, other living marine resources, and wildlife therein, <u>are ecologically fragile and consequently extremely vulnerable to destruction by man's alterations.</u>"  16 U.S.C. § 1451(d).   (Emphasis added)

91.     A state seeking to benefit from the provisions of the CZMA must adopt a state management program for its coastal zone that complies with the federally-required program elements, and submit the program to the federal government for approval.  15 U.S.C. § 1555.

88. Section 302(i) of the CZMA further recognizes that:

> The key to more effective protection and use of the land and water resources of the coastal zone is to encourage the states to exercise their full authority over the lands and waters in the coastal zone by assisting the states, in cooperation with federal and local governments and other vitally affected interests, in developing land and water use programs for the coastal zone, including unified policies, criteria, standards, methods, and processes for dealing with land and water use decisions of more than local significance.

16 U.S.C. § 1451(i).

92.     To further these purposes, Section 307(c) of the CZMA requires that Federal agency activities that affect the resources of a State's coastal zone, including those that take place outside of the coastal zone, be carried out in a manner that is "consistent to the maximum extent practicable with the enforceable policies" of the

State's coastal management program.  16 U.S.C. § 1456(c)(1)(A).

93.   Enforceable policies include the state policies "'which are legally binding through constitutional provisions, laws, regulations, land use plans, ordinances, or judicial or administrative decisions, by which a State exerts control over private and public land and water uses and natural resources in the coastal zone' and which are incorporated in an [approved] management program."  15 C.F.R. § 930.10(h) (quoting 16 U.S.C. § 1453(6a)).

94. For purposes of the CZMA, a "Federal agency activity" is defined as "any functions performed by or on behalf of a Federal agency in the exercise of its statutory responsibilities" and includes a wide range of activities that initiate an event or series of events where coastal effects are reasonably foreseeable.  15 C.F.R. § 930.31(a).

95. Section 307(c) further requires Federal agencies to submit a "consistency determination" to an affected State before final approval of proposed agency activities that will affect any land or water use or natural resource of the coastal zone.  16 U.S.C. § 1456(c)(1)(C).

96.   Defendant, the Corps of Engineers, is a Federal agency within the definitions of the CZMA. *See* 15 C.F.R. § 930.11(j).

97. Florida's federally approved management program, the Florida Coastal Management Program ("FCMP"), was approved by NOAA in 1981, and the most recent approval of amendments occurred in 2005. 46 F.R. 48742-01; 53 F.R. 50069-01; 70 F.R. 29260. Florida's coastal zone is the entire State, including Apalachicola River and Bay. Therefore, Federal agency actions which affect Apalachicola River and Bay must be consistent to the maximum extent practicable with the FCMP.

98. Among the enforceable policies of the State's approved coastal management program, Chapter 373, Florida Statutes authorizes the Department of Environmental Protection ("DEP") and the Northwest Florida Water Management District ("NWFWMD") to regulate the withdrawal, diversion, storage, and consumption of water in the Apalachicola River and its tributaries. Accordingly, all actions affecting the withdrawal, diversion, storage, and consumption of water in the ACF System within Florida, must comply with the enforceable policies of the water resources statutes as administered by the DEP and the NWFWMD.

99. One such policy requires State regulators to "take into account cumulative impacts on water resources and manage those resources in a manner to ensure their sustainability." Fla. Stat. § 373.016(2). Other policies require promotion of the availability of sufficient water for all existing and future reasonable-beneficial uses and natural systems, and preservation of natural resources, fish and wildlife. Fla. Stat. § 373.016(3)(d), (g). (Emphasis added)

100. The State's general water policy implements these statutes by, among other items, requiring the maintenance of water quality and decisions that "[r]eserve from use that water necessary to support essential non-withdrawal demands, including navigation, recreation, and the protection of fish and wildlife." Fla. Admin. Code r. 62-40.310(1).

101. In addition to these policies, if a proposed activity entails a consumptive use of water, the DEP and NWFWMD must apply three standards. *See* Fla. Stat. §§ 373.223(1); .239(3); Fla. Admin. Code r. 40A-2.301. First, the proposed activity must be a "reasonable beneficial use" of water, including whether water can be withdrawn

without causing harm to the resource and whether the proposed use would significantly affect natural systems. *See* Fla. Admin. Code r. 62-40.410(2). A reasonable beneficial use means "in such quantity as is necessary for economic and efficient utilization for a purpose and in a manner which is both reasonable and consistent with the public interest." Fla. Stat. § 373.019(5). Second, the use must not interfere with any presently existing legal use of water. Third, the use must be consistent with the public interest. Fla. Stat. § 373.223(1).

102.     Under Chapter 373, Part IV, Florida Statutes, the NWFWMD may impose reasonable conditions that are necessary to assure that the operation or maintenance of any dam, impoundment, reservoir, appurtenant work, or works is consistent with the provisions of the water resources statute and applicable rules, is not inconsistent with the overall objectives of the district, and will not be harmful to the water resources of the district. Fla. Stat. §§ 373.171(a); 416(1).

103.     If an activity involving the management and storage of surface waters is proposed for State-owned lands, such as aquatic preserves, then DEP and NWFWMD's approval is further conditioned upon the authorizations required under Chapters 253 and 258. Fla. Stat. § 373.422. Submerged lands must be managed primarily for maintenance of essentially natural conditions, the propagation of fish and wildlife, and public recreation. Fla. Stat. § 253.034(2)(b); *see also* Fla. Stat. § 370.25 (charging the Florida Fish and Wildlife Conservation Commission with protecting marine fisheries). Aquatic preserves are set aside to be maintained essentially in a natural condition. Fla. Stat. § 258.36.

104.    Florida's water resources statutes also prohibit activities that cause "pollution." Fla. Stat. § 373.430(1)(a); *see also* Fla. Stat. § 403.161. Florida's environmental statutes define "pollution" broadly to include the presence in state waters of any human-induced impairment of waters, or alteration of the chemical, physical, or biological integrity of water in quantities or at levels which are or may be potentially harmful or injurious to animal or plant life.  Fla. Stat. § 403.031(7). Pursuant to this definition, activities that result in flow reductions that harm aquatic life would constitute "pollution" prohibited by Florida's water resource statutes and environmental statutes.

105.    The State of Florida has designated the Apalachicola River as "Outstanding Florida Waters" and "Special Waters."  *See* Fla. Admin. Code r. 62-302.700.  Once the designation has been made, the state of Florida does not allow the degradation of water except for specifically-identified instances.  *Id.*; Fla. Admin. Code r. 62-4.242(2).

106.    Lastly, Florida has statutes and policies in place to protect species which are endangered, threatened, or of special concern. *See* Fla. Stat. §§ 372.072;.0725. The laws "provide for research and management to conserve and protect these species as a natural resource." Fla. Stat. § 372.072.

## VI. DEFENDANTS ACTIONS AND FAILURES TO ACT

107.     In operating the dams, reservoirs and related facilities in the ACF System, Defendants have taken discrete final agency actions, and have failed to take discrete final agency actions, in violation of law. These have included final dispositions in various matters, the granting of permission or assistance to various persons, and the taking of actions on the application or petition of, and beneficial to, various persons, or the

equivalent thereof, including those described in the following paragraphs.

108.    The Corps' decisions and implementing actions in operating the dams, reservoirs and related facilities in the ACF System, constitute a series of discrete final agency actions that affect the amount and timing of releases from those projects.  Each time the Corps takes such an action it is a discrete final agency action subject to review under the APA.

### A. The Corps' Reservoir Operations to Support Water Supply

109.    The Corps has taken unlawful final agency actions to support municipal and industrial water supply through the execution and continuance of contracts for water supply; development, revision and implementation of water control plans; and regularly scheduled (and sometimes unscheduled and unannounced) water retention and release decisions.   Some of these decisions or actions individually and in combination have in the last five years and in particular the last 12 months resulted in the failure to provide the necessary salinity balance required for the viability of the organism referred to as Apalachicola Bay causing the catastrophic damage to the ecosystem and death to oyster bars, shrimp and other marine life.

### The Corps' Contract Actions

110.    Prior to 1973, the Corps executed two "relocation contracts" authorizing the withdrawal of water for municipal and industrial purposes from Lake Lanier by the cities of Buford and Gainesville, Georgia, both of which had withdrawn water from the area eventually inundated by Lake Lanier.

111.    The Buford contract was executed on December 19, 1955.  The contract provided for the withdrawal of 2 million gallons per day ("MGD") from Lake Lanier. The

contract required the execution of a new contract if Buford desired to exceed that limit. On information and belief, the Buford contract has not been modified and remains in effect as executed.  However, Buford has requested that the contract be modified to more than double authorized withdrawals.

112.    The Gainesville contract was executed on June 22, 1953.  That contract provided for the withdrawal of not more than 8 MGD from Lake Lanier.  That contract was superseded on May 28, 1987 by an interim water supply contract, Contract No. DACW01-9-85-224. The new contract granted a "privilege" to withdraw 20 MGD from Lake Lanier.  The contract was terminable by either party on 6 months notice.  The contract provided that the water withdrawn was to be used in a manner "consistent with Federal laws."  The contract terminated on January 1, 1990 by virtue of an August 3, 1989 "supplement" which provided for its termination as of January 1, 1990.  Thereafter, the Corps treated such contract as a "holdover" contract, with the exception that the permitted withdrawals under the "holdover" contract have increased since 1990.

113.    In December 2002, the Corps attempted to resurrect the expired Gainesville contract by executing a new water supply contract with Gainesville, which became part of a settlement in *Southeastern Federal Power Customers, Inc. v. Caldera*, Case No. 1:00CV02975 (D.D.C.) (the "D.C. litigation"), as more particularly described below.  Exhibit D to the settlement agreement was styled "Supplemental Agreement to Relocation Contract between the United States of America and the City of Gainesville for Withdrawal of Water from Lake Sidney Lanier, Georgia."  The new contract purports to authorize withdrawals from Lake Lanier up to 18 MGD.  On information and belief, although the initial contract expired, the Corps has made a discrete agreement with

Gainesville to allow Gainesville to continue to withdraw water between 1990 and 2002 in ever increasing amounts until execution of the 2002 contract. The Corps currently authorizes and facilitates through its daily reservoir operations the withdrawal of water from Lake Lanier by Gainesville as if the new Gainesville contract were lawful. The Corps' decision to continue to authorize and facilitate the withdrawal of water from Lake Lanier by Gainesville, whether under the terms of the 2002 contract or otherwise, constitutes an individual, discrete final agency action.

114.    Beginning in 1973, the Corps entered into a series of additional contracts with municipalities and other political subdivisions in the State of Georgia permitting those entities to withdraw, and providing for the Corps' release of, millions of gallons of water per day for municipal and industrial use from conservation storage in Lake Lanier. By 1986, the Corps had entered into additional water supply contracts or agreements with the City of Cumming, Georgia; Gwinnett County, Georgia; and the Atlanta Regional Commission ("ARC") (collectively, along with the cities of Buford and Gainesville, the "Georgia water supply providers").

115.    The Cumming contract, Contract No. DACW01-9-77-1096, was executed on June 27, 1978. The contract granted a "privilege" to withdraw 2.5 MGD from Lake Lanier. The contract was terminable by either party on 6 months notice. The contract required that the water withdrawn under it must be used "consistent with Federal laws." The contract expired on June 27, 1983 and was "retroactively" extended on August 19, 1985. That extension also increased the rate of withdrawal to 5 MGD. On November 11, 1988, the contract was modified again to double the rate of withdrawal to 10 MGD. The contract terminated on January 1, 1990 by virtue of the July 5, 1989 "supplemental

agreement" which provided for its termination as of January 1, 1990.  Thereafter, the Corps treated such contract as a "holdover" contract, with the exception that the permitted withdrawals under the "holdover" contract have increased since 1990.

116. The Corps currently authorizes and facilitates through its daily reservoir operations the withdrawal of water from Lake Lanier by Cumming as a "holdover" contract, except that the withdrawals have increased since 1990.  The Corps' decision to continue to authorize and facilitate the withdrawal of water from Lake Lanier by Cumming constitutes an individual, discrete final agency action.

117.    The Gwinnett County contract, Contract No. DACW01-9-73-624, was executed on July 2, 1973.  The contract provided Gwinnett County with a "privilege" to withdraw 40 MGD from Lake Lanier.  The contract was terminable by either party on 3 years notice. The contract reserved to the Government the right to take such measures "as may be necessary to satisfy project purposes." The contract required that water withdrawn be used in a manner "consistent with Federal laws."  The contract was modified five times and, as of December 15, 1988, provided Gwinnett County with a privilege to withdraw 53 MGD from Lake Lanier. The contract terminated on January 1, 1990 by virtue of the July 24, 1989 "supplemental agreement" which provided for termination as of January 1, 1990. Thereafter, the Corps treated such contract as a "holdover" contract, with the exception that the permitted withdrawals under the "holdover" contract have increased since 1990.

118.    The Corps currently authorizes and facilitates through its daily

reservoir operations the withdrawal of water from Lake Lanier by Gwinnett County as a "holdover" contract, except that the withdrawals have increased since 1990. The Corps' decision to continue to authorize and facilitate the withdrawal of water from Lake Lanier by Gwinnett County constitutes an individual, discrete final agency action.

119.    The ARC contract, Contract No. DACW01-9-86-145, was executed on June 17, 1986. ARC executed the contract acting as an agent for the City of Atlanta and Cobb, DeKalb, Fulton and Gwinnett Counties. The contract provided for the Corps' release of 377 MGD from Lake Lanier for the benefit of the ARC for subsequent downstream withdrawal from the Chattahoochee River.  The contract reserved to the Government the right to take such measures as may be necessary "to satisfy project purposes."  The contract requires that water withdrawn under it be used in a manner "consistent with Federal laws."  The contract terminated on January 1, 1990 by virtue of the June 22, 1989 "supplemental agreement" which provided for termination as of January 1, 1990.  Thereafter, the Corps treated such contract as a "holdover" contract, with the exception that the permitted withdrawals under the "holdover" contract have increased since 1990.

120.    The Corps currently authorizes and facilitates through its daily reservoir operations the release of water for downstream withdrawal by ARC as a "holdover" contract, except that the withdrawals have increased since 1990.  The Corps' decision to release such water from Lake Lanier constitutes an individual, discrete final agency action.

121.    Despite the expiration in January 1990 of all contracts (other than

Buford's), and the invalidity of the recently executed Gainesville contract, the Corps continues to authorize and facilitate municipal and industrial withdrawals and releases from Lake Lanier, without interruption and in increasing quantities, to support municipal and industrial use by the Georgia water supply providers. Subsequent to 1990, the Corps authorized and facilitated withdrawals from Lake Lanier for municipal and industrial purposes in amounts totaling approximately 85 million gallons per day, or more than 95,000 acre feet per year, and authorized and facilitated releases from Lake Lanier to support withdrawals from the Chattahoochee River of approximately 377 million gallons per day, or more than 422,000 acre feet per year.

122.    Without any consideration of the minimum fresh water flow requirements for the viability of the Apalachicola Bay ecosystem and consequently the economy and ecology of the City of Apalachicola and its residents, the Corps today continually facilitates and allows an ever increasing amount of water to be withdrawn and released from Lake Lanier for municipal and industrial use, substantially in the manner anticipated in the PAC Report described below in Paragraph 120.  Each of the Corps' actions in so doing is a final agency action.  By way of illustration only, as of 1999, amounts being withdrawn and released approximated 430 MGD. In December 2002, the Georgia Department of Natural Resources projected that 705 MGD would be withdrawn from Lake Lanier and the Chattahoochee River above Peachtree Creek by 2030. The Corps' decisions to allow and facilitate these unauthorized withdrawals and releases result in the loss of hundreds of millions of gallons of water from the ACF System every day reducing below that which is obviously necessary for the existence of Apalachicola Bay as an ecosystem that produces and provides the habitat for the oysters,  shrimp, finfish and

other marine seafood produced and harvested in Apalachicola, Florida.

### The Corps' Operational Plans and Manuals

123.     In October 1989, the Corps' Mobile Engineer District issued a draft Post

Authorization Change Notification Report for Lake Lanier (hereinafter "PAC Report") in

order to convert the interim withdrawal contracts to permanent water storage contracts.

The Corps proposed to reallocate from Lake Lanier for water supply purposes the

equivalent of approximately 327 million gallons per day for existing uses, with projected

increased uses of up to 529 million gallons per day by 2010.  The Corps prepared the

PAC Report in <u>anticipation of seeking Congressional authorization</u>, as required by

statute, for the reallocation of water storage in Lake Lanier to serve municipal and

industrial purposes.  The Corps later withdrew the PAC Report, and did not request

Congressional authorization for such a reallocation.

124.     The Corps has not issued a lawful water control plan as required by

federal regulations. In October 1989 and in connection with the PAC Report, the Corps

issued a draft *Apalachicola-Chattahoochee-Flint Basin Water Control Plan* (hereinafter

the "draft ACF Water Control Plan"). The draft ACF Water Control Plan, and subsequent

revisions to the Plan, were not properly promulgated consistent with existing Federal

requirements, Corps policies or NEPA procedures, and was not subjected to ESA review.

Although the draft ACF Water Control Plan did not receive final approval, the Corps has

not withdrawn the Plan nor completed the required NEPA review.  Nor has the Corps

issued a proper, up-to-date water control plan. On information and belief, the Corps

operates the ACF System reservoirs in substantial conformance with the draft ACF Water

Control Plan.  The Corps' issuance and implementation of the draft ACF Water Control

Plan is a major federal action significantly affecting the quality of the environment and thus its implementation violates NEPA.

125.    The draft ACF Water Control Plan does not conform with the objectives of the original Congressionally-authorized purposes of the ACF System.  Specifically, the Plan provides priority to municipal and industrial water supply and recreation purposes and does not provide priority to the original Congressionally-authorized purposes of navigation and hydropower and has failed to provide the priority required by law and logic to ensure that the receiving organism (Apalachicola Bay) for the arterial flow of fresh water, receives at least the minimum amount required for the continued existence of this organism.

126.    Assumptions contained within the draft ACF Water Control Plan reflect a change in Corps' policy that favors municipal and industrial water supply and recreation over the authorized project purposes of flood control, hydropower and navigation. Issuance and implementation of the draft ACF Water Control Plan is final agency action.

127.    The draft ACF Water Control Plan establishes, among other things, the "action zones" that drive the Corps' management of the ACF Basin reservoirs, and the minimum flow "requirement" of 5,000 CFS to the Apalachicola River, that has now been reduced to 4,150 CFS.  The "action zones" apply to each of the major storage projects in the ACF Basin (Buford, West Point and George). According to the Corps:

> These zones are used to manage the lakes at the highest level possible for recreation and other purposes that benefit from high lake levels.  The actions zones also provide guidance on meeting minimum hydropower needs at each project as well as determine the amount of storage available for downstream purposes such as navigation, water supply, water quality. These zones were derived based on the past operation of the projects which considered time-of-year, historical pool level/release relationships,

operational limits for conservation and recreational resource impact levels. The action zones are basic guidelines for operating the river system, however there may be other factors and activities that may cause the lakes to operate differently than the zones shown on the graphs. Some of these factors range from flood control actions, fish spawn operations, maintenance and repair of turbines, emergency situations such as drownings and chemical spills, drawdowns due to shoreline maintenance, releases made to free stuck barges, and other circumstances. (Emphasis added)  http://water.sam.usace.army.mil/zones.htm

128.    "Zone 1 indicates that releases can be made in support of seasonal navigation (when the channel has been adequately maintained), hydropower releases, and water supply, and water quality releases. If the all lakes are in Zone 1 or above, the river system would operate in a fairly normal manner." http://water.sam.usace.army.mil/zones.htm.  "Zone 2 indicates that water to support seasonal navigation may be limited.  Hydropower generation is supported at a reduced level. Water supply and water quality releases are met. Minimum flow targets are met." *Id.*  "Zone 3 indicates that water to support seasonal navigation may be significantly limited.  Hydropower generation is supported at a reduced level.  Water supply and water quality releases are met.  Minimum flow targets are met."  *Id.* "Zone 4 indicates that navigation is not supported.  Hydropower demands will be met at minimum level and may only occur for concurrent uses. Water supply and water quality releases are met. Minimum flow targets are met." *Id.*

129.    The Corps has not re-issued a lawful "Master Manual" for the ACF System, as required by federal regulation. The 1958 *Apalachicola River Basin Reservoir Regulation Manual* and appendices are outdated and no longer reflect the ACF System as it exists today.

130.    More recent reservoir regulation manuals were not properly promulgated

and are inconsistent with the Congressionally-authorized project purposes of flood control, hydropower and navigation. The Corps' failure to issue a lawful "Master Manual" for the ACF System is final agency action unlawfully withheld.

131.   Alternatively, to the extent that the 1958 *Regulation Manual* and its appendices could be considered the "Master Manual" currently in effect for the ACF System, the Corps is not acting in accordance with the 1958 *Regulation Manual*. The Corps' failure to act in accordance with the 1958 *Regulation Manual* is final agency action.

### *Regular Decisions on Water Retention and Releases at Lake Lanier*

132.   Defendants' have taken, and continue to take, discrete agency actions, on a regularly scheduled basis, that disallow or restrict releases from Lake Lanier for downstream purposes in order to store water in Lake Lanier for municipal and industrial water supply purposes. Defendants meet regularly with water supply users, hydropower users, navigation users and recreational users in Georgia to decide the nature and extent of these actions.  During dry-weather periods, Defendants' actions ensure the retention of water for municipal and industrial supply at the expense of the project's authorized purposes, the needs of federally-listed species in the Apalachicola River Basin and the minimum level of fresh water flow required to allow the survival of the Apalachicola Bay ecosystem. Each of these actions is a final agency action.

### B. The Corps' Reservoir Operations to Support Recreation

133.   Consistent with the Congressionally-authorized purposes for the Corps'

ACF System facilities, no storage has been allocated in those facilities for recreational purposes.   The draft ACF Water Control Plan nevertheless purports to protect storage for the benefit of recreation at the expense of the projects' purposes for which storage was allocated.  The draft ACF Water Control Plan states at 21:

> Water Management for Recreation.  Recreation interests desire that pools remain as close to the top of conservation pool as possible.  When pool levels must be lowered in response to other demands, then the rate at which these drawdowns occur should be as steady as possible.  There may be times when water releases are reduced to levels which satisfy only water supply/water quality requirements. This conservation of storage will generally allow the pools to be maintained at a higher level throughout the prime recreation season.

> Management for recreation interests is incorporated into the plan in the manner in which the action zones were defined.  The line separating Zone 2 from Zone 3 lies near or above the Initial Impact Level, (IIL), at the beginning of the recreation season. At the end of the season, the upper limit of Zone 3 lies generally between the IIL and the Recreation Impact Level.  If lake levels fall to Zone 3 then releases will normally be limited to 2-hour-a-day generation and minimal navigation support, which will tend to stabilize the lake levels until the end of the season.

134    The Corps meets regularly with recreational interests and others in Georgia to decide and implement actions that retain water in Lake Lanier and limit water releases from Lake Lanier in support of the provisions of the draft ACF Water Control Plan discussed in Paragraph 141, above. Such decisions and actions constitute final agency action.

135.    Congress did not authorize fish and wildlife as a purpose of any of the main stem reservoirs in the ACF System, except West Point Dam.   Nevertheless, the Corps regularly takes final agency actions to retain water in those reservoirs to support non-native fisheries to the detriment of the Apalachicola Bay ecosystem and the City of

Apalachicola. Such actions limit the amount of water that would otherwise be released during the Gulf sturgeon spawning season.

136.    The Corps adopted division regulation DR 1130-2-16 (Lake Regulation and Coordination for Fish Management Purposes) on March 30, 2001, which superseded DR 1130-2-16 (April 1, 1993). The regulation "provides policy for administration of a water management program to balance the multiple resource management responsibilities of water resource projects during the fish-spawn season."  It applies to all of the reservoirs in the ACF System.  The policy "establish[es] priority for water level management to aid fish spawning for the purpose of maintaining balanced fish populations on Corps water resources projects within the South Atlantic Division."  The policy calls for the retention of water in Lake Lanier and Lake Seminole, among other reservoirs, to maintain stable lake levels for 4 to 6 weeks during the spring spawn of reservoir sport-fish. The policy is "primarily targeted at largemouth bass."  The Corps regularly takes discrete, final agency actions to implement this policy by retaining water in these lakes at the expense of other authorized purposes and downstream uses include the catastrophic damage to the Apalachicola Bay and the City of Apalachicola, Florida.

137.    In addition, the Corps regularly takes discrete, final agency actions to disallow or restrict releases from Lake Lanier so as to maintain water levels in the Lake to support recreation, particularly during the peak recreation season between Memorial Day and Labor Day, at the expense of other authorized purposes and downstream uses. Although the specified conservation pool for Lake Lanier is between 1035 and 1070 feet

above sea level, the Corps maintains the water level at or above 1052.66 feet above sea level, with levels usually maintained near the top or in excess of the conservation pool. Consequently, a significant percentage of the available conservation storage in Lake Lanier remains completely unutilized, at the expense of hydropower, navigation, water quality, ecological needs and other downstream uses, including but not limited to the Apalachicola Bay ecosystem and the City of Apalachicola.

138.    For example, in May 2005, the Corps took action to retain water in Lake Lanier at between 1070 and 1071 feet above sea level (the top of the conservation pool) during a critical period when additional water from Lake Lanier was needed to support Gulf sturgeon spawning activities below Jim Woodruff Lock and Dam.  As of June 8, 2007, Lake Lanier's pool level exceeded 1066 feet above sea level, but the flow in the Apalachicola River remained at a minimum supply level of 5,000 CFS which has now been reduced below the level. *See* http://water.sam.usace.army.mil/ acfframe.htm

### C. The Corps' Reservoir Operations Affecting Navigation

139.    The Corps maintains the Apalachicola River as a navigation corridor for shipping and other stream traffic. Congress authorized a 9-foot deep, 100-foot wide navigation channel from the City of Apalachicola, Florida to Lake Seminole and beyond. In general, flow regulation for navigation on the Apalachicola River requires the integrated management of all reservoirs in the ACF System, from Lake Lanier downstream to Lake Seminole.   The Congressional authorization for Lake Lanier specifies that it is intended to provide releases that will ensure continuous flow at all times in the Apalachicola River for navigation.

140.    In the past, the Corps has manipulated storage and taken actions to control releases from reservoirs in the ACF System during low-flow periods to provide limited "navigation windows" below Jim Woodruff Lock and Dam. The Corps creates these windows by releasing large pulses of water for brief periods, which result in the inundation and subsequent rapid dewatering of important aquatic habitats, including Gulf sturgeon spawning grounds during spawning activities.  The dewatered areas also contain members of the protected mussel species identified above. The draft ACF Water Control Plan contains water management guidelines for navigation, and sets desired target flow releases from Woodruff Dam into the Apalachicola River.

141.    The Corps implemented these navigation windows in the past in 2000 and 2002, which severely hurt the ecological interests of Florida and the City of Apalachicola as Apalachicola Bay requires for its viability a constant minimum flow of fresh water which minimum has obviously been breached due to the death of several oyster bars in Apalachicola Bay. Although the Corps appears to have ceased using these navigation windows, if the Corps intends to reinstitute such navigation windows in future water-short years, the City of Apalachicola reserves the right to amend this Complaint to challenge the future use of such navigation windows.

### The Corps' Decision to Consult on the IOP

142.    On June 12, 2006, the Corps informed the FWS of a series of changes to the IOP, including that flow measurements would henceforth be conducted at the Chattahoochee gage downstream of Woodruff Dam.  Due to dam seepage and other inflows below the dam, the flow at the Chattahoochee gage is approximately 400-600

CFS higher than at Woodruff Dam.  Thus, as a practical matter, while the Corps used to maintain a discharge from Woodruff Dam of 5,000 CFS (5,400-5,600 at Chattahoochee), the Corps then maintained a discharge from Woodruff of 4,400-4,600 at the dam (5,000 at Chattahoochee) which is now correspondingly reduced due to the recent action by the Corps allowing discharges from Woodruff of below 5,000 CFS at Chattahoochee..  As a result, flows in the River are lower under the IOP than have ever been experienced since the dams were placed.

143.    Florida provided extensive technical input to the Corps explaining how a higher base flow of between 5,700 CFS and 6,300 CFS could be maintained at all times in the Apalachicola River if certain operational adjustments were made.  The Corps, however, summarily rejected Florida's input, in part, because the Corps concluded Florida's suggestions could not be implemented since they were outside the scope of the Corps' 1989 Draft Water Control Plan – a plan never formally adopted, but nevertheless, implemented without compliance with the Flood Control Act, Corps regulation, or the Nation's environmental laws, including the ESA.

144.    As explained in the Corps' March 7, 2007 EA/FONSI, Concept 5 modifies the flows that were experienced under the original IOP, so as to create the Modified IOP.  Under the Modified IOP, the Corps will increase storage during the spring and support a higher release in the summer, until the Corps determines that there is not enough water to sustain the higher flow, at which time flows will revert to now below 5,000 CFS..  The Corps' decision to revert from a flow of 6,500 CFS  to now  below 5,000 CFS will be based on the amount of "composite storage" in the Chattahoochee River reservoir system, which in turn is based on and measured against the action zones established in the 1989

Draft Water Control Plan. The flow minimum will be set at 6,500 CFS as long as composite storage is above "Zone 3."  When composite storage falls into Zone 3, the Corps will immediately reduce flows to 5,000 CFS until composite storage increases back to "Zone 1."

145.    Operations under the Modified IOP, although supposedly developed for the sole purpose of minimizing the impact of authorized take on the mussel species, are likely to result in the mussels experiencing during 2007 the longest continuous period of flow at or below  5,000 CFS at any time in recorded history.  The same is true of the river flow into the Apalachicola Bay.

146.    The Corps never has consulted on the 1989 Draft Water Control Plan or its implementation of that plan.  The IOP and the Modified IOP articulate just a part of the Corps' operation of the ACF Basin reservoirs as more generally set forth and dictated by 1989 Draft Water Control Plan. The Corps, simply put, has not consulted on its operations as required by ESA Section 7.

**D.  The Corps Environmental Assessments and Findings of No Significant Impact for the Interim Operations Plan and Modifications to the Interim Operations Plan**

147.    In October, 2006, the Corps prepared an EA/FONSI for the original IOP, which concluded that "[a]n evaluation of the [EA] describing the proposed action shows that the proposed action would have no significant environmental or human impacts," and "[t]herefore, an environmental impact statement is not required."  *See* Finding of No Significant Impact for the Interim Operations Plan for Support of Endangered and Threatened Species Jim Woodruff Dam Gadsden and Jackson Counties, Florida, and Decatur County, Georgia at 2.

148.    Subsequently, on March 6, 2007, the Corps prepared an EA/FONSI for the Modified IOP.  Similar to the FONSI approved by the Corps on October 9, 2006 relating to the original IOP, the Corps' FONSI for the Modified IOP, signed and dated March 8, 2007, concluded that "[a]n evaluation of the [EA] describing the proposed action shows that the proposed action would have no significant environmental or human impacts," and "[t]herefore, an environmental impact statement is not required."  *See* Finding of No Significant Impact for Modifications to the Interim Operations Plan for Support of Endangered and Threatened Species Jim Woodruff Dam Gadsden and Jackson Counties, Florida, and Decatur County, Georgia at 2; *see also* Finding of No Significant Impact for the Interim Operations Plan for Support of Endangered and Threatened Species Jim Woodruff Dam Gadsden and Jackson Counties, Florida, and Decatur County, Georgia at 2.  The Corps' March 2007 EA/FONSI contains the prior October 2006 EA/FONSI for the original IOP in its Appendix. Because the Corps' EAs for the original IOP and Modified IOP, among other things, do not adequately assess alternatives to the proposed action, and do not adequately evaluate cumulative impacts of the proposed action as required under NEPA, the EAs are arbitrary, capricious, an abuse of discretion, and not in accordance with the requirements of NEPA.

149.    Both the EA for the Modified IOP and the EA for the original IOP indicate that the Corps operates five dams in the ACF River Basin as part of an integrated system.  The dams, and their corresponding lakes, in downstream order are as follows: Buford (Lake Lanier); West Point (Lake West Point); George (Lake George); Andrews; and Woodruff (Lake Seminole).

150.    Notwithstanding the Corps' description of the integrated system of five

Corps dams in the ACF basin, both the EA for the Modified IOP and the EA for the original IOP narrowly define the purpose and need for the proposed action as seeking "to avoid and minimize impacts to the federally threatened Gulf sturgeon and federally endangered fat threeridge, federally threatened purple bankclimber, and federally threatened Chipola slabshell mussels; and designated Gulf sturgeon critical habitat and proposed critical habitat for the mussels in the Apalachicola River as a result of existing water management operations and releases from Jim Woodruff Dam."  Without defining the purpose and need for the proposed actions to consider how existing water management operations and releases from the four other dams in the integrated ACF system may impact the federally endangered and threatened species described above, the Corps unlawfully limits consideration of other reasonable alternatives to the proposed actions in violation of NEPA.  Such alternatives may include, among other things, changes in operations and water allocations upstream of Woodruff Dam that would facilitate greater releases of water from Woodruff Dam into the Apalachicola River.

151.    The EA for the Modified IOP and the EA for the original IOP also violate NEPA by not properly analyzing the "no action" alternative.  The Corps unlawfully accepts a creeping baseline by analyzing the "no action" alternative using the low flow operation protocols implemented at Woodruff Dam in 2004 and 2005 in the absence of the original IOP and Modified IOP.

152.    The EA for the Modified IOP and EA for the original IOP observe that the most recent approved Water Control Plan for the ACF system is dated 1959 and that a draft Water Control Plan for the ACF was completed in 1989.  However, the EAs further note that "[f]inalizing the 1989 *Draft Water Control Plan* awaits resolution of ongoing

litigation filed by the State of Alabama in 1990 in the District Court for the Northern District of Alabama, which is currently the subject of court-ordered mediation.  It is expected that any update of water control plans would include formal consultation under Section 7 and additional [NEPA] documentation regarding system operations."  The EAs violate NEPA by failing to analyze the cumulative impacts of the original IOP and the modifications to the IOP in conjunction with the reasonably foreseeable future actions associated with the draft Water Control Plan.

153.   Section 2 of the March 6, 2007 EA for the Modified IOP, entitled "Affected Environment," incorporates by reference the Corps' October 2006 EA, and notes that "[a] detailed description of the environmental setting and significant resources occurring in the project area are available in the Environmental Assessment Interim Operations Plan for Support of Endangered and Threatened Species Jim Woodruff Dam (USACE 2006) located in Appendix A." The discussion of "Affected Environment" in the October 2006 EA indicates that the Corps is considering entering into "interim water storage contracts at Lake Lanier for several municipalities and local governments, pursuant to the Southeastern Federal Power Customers, Inc. settlement agreement (1:00CV02954-TPJ), with the potential for the interim water storage contracts to roll over to permanent reallocation storage contracts in the future." The October 2006 EA also states that "[t]he Mobile District has published in the Federal Register on 16 June 2006 a notice of intent to prepare an environmental impact statement (EIS) to address the proposed interim storage contracts," and that "[t]he EIS will address the impacts of the proposed interim storage contracts at Lake Lanier and any changes to project operations at Lake Lanier or the downstream projects required for implementation of the interim

storage contracts." As the proposed interim water storage contracts at Lake Lanier are related to the integrated ACF system and may impact Basin Inflows at Woodruff Dam and releases from Woodruff Dam, the Corps must consider and analyze the cumulative impacts of the IOP and the Modified IOP with the reasonably foreseeable future impacts of the interim water storage contracts.  Other than the mere statement that "increases in consumptive depletions in the ACF Basin could adversely affect habitat in the Apalachicola River and Apalachicola Bay by further altering the natural flow regime," the Corps' EAs fail to comply with NEPA, as they do not sufficiently analyze the cumulative impacts of the IOP and the Modified IOP in conjunction with the impacts of the reasonably foreseeable interim water storage contracts in Lake Lanier.

### E. The Corps' Non-Compliance with the Modified IOP and the BiOp

154.    Under the BiOp and Modified IOP, the Corps must, from March through May, deliver at the Chattahoochee gage a daily average flow equivalent to the 7-day moving average "Basin Inflow" for the preceding 7 days whenever "Basin Inflow" recedes below 18,000 CFS.

155.    In March and April 2007, the Corps violated its own Modified IOP by failing to deliver water at the Chattahoochee gage on the schedule set forth in the foregoing paragraph. The Corps under-released by approximately 64,000 acre-feet of water from March 1 through April 16, 2007.   This mode of operation has continued by the Corp's through the date of this complaint including additional authority actions allowing reductions in flow below 5,000 CFS.

156.    Despite this violation of its own Modified IOP, the Corps has not reinitiated the consultation with the Service with respect thereto.

### F.   Effects on Florida's Coastal Zone, and the Corps Failure to Comply

157.    Defendants' actions in operating the dams, reservoirs and related facilities of the ACF Basin, including those actions specifically set forth herein, are Federal agency activities that affect the land and water use and natural resources of Florida's coastal zone and in particular Apalachicola Bay and the City of Apalachicola, Florida as aforementioned.  Specific final agency actions taken by Defendants include authorizing withdrawals, releases and use of water from Lake Lanier for municipal and industrial purposes; and entering into the Gainesville contract; retaining water in and limiting releases from Lake Lanier to support recreation and fish and wildlife in Lake Lanier; limiting amounts and timing of releases from Lake Lanier that are needed to support navigation and other project purposes; and issuing, revising and implementing an unlawful draft ACF Water Control Plan.

158.    Defendants' activities directly affect the freshwater flows of the Apalachicola River, Florida's coastal zone resources, and the Apalachicola Bay and Estuary and consequently, the City of Apalachicola, Florida.   Under the Florida Constitution, submerged lands of the Apalachicola and Bay are held in trust for the people of Florida. Fla. Const. Art. X, § 11. In addition, the Apalachicola Bay is designated an aquatic preserve, with exceptional biological, aesthetic, and scientific value to the State and the City of Apalachicola as aforementioned.

Fla. Stat. § 258.39(18). The Apalachicola Bay and Apalachicola River are also designated Outstanding Florida Waters under Florida's regulations.  F.A.C. § 62-

302.700(9).

159.     Effects on Florida's coastal resources from Corps activities include but are not limited to:  reductions in freshwater flows into the Bay and estuary that have had a devasting effect on the Apalachicola oyster bars, shrimp, crabs and other marine life and seafood and reduction in freshwater flows from the upper watershed that impacts estuary productivity by reducing nutritional input for developing larvae and juveniles; changes in frequency, duration, magnitude and timing of inundation of aquatic habitats in the floodplain of the Apalachicola River that detrimentally impact biological communities, including fishes, aquatic invertebrates, other river-floodplain animals, and floodplain vegetation; flow reductions that adversely modify critical habitat for the threatened Gulf sturgeon and take members of the species; reduction in annual floods that increase the frequency and severity of drought-like conditions, isolate aquatic habitats from the main river channel and cause degradation in water quality from decreases in dissolved oxygen; reduced floodplain habitat that results in loss of habitat for spawning, feeding, and nursery areas for fish and wildlife, including species of special concern under Florida law; hydrologic alterations in the floodplain that alter forest composition and increase the risk of invasion by exotic plants;   reductions in freshwater flows in the Bay and estuary that impact early life stages of blue crabs and oysters;   reduction in freshwater flows from the upper watershed that impacts estuary productivity by reducing nutritional input for developing larvae and juveniles.

160.     In a letter dated December 15, 1989, the Florida Department of Environmental Regulation notified Defendants that the proposed changes in regulation of Lake Lanier, as described in the PAC Report and draft Water Control Plan, "may

significantly affect the water quantity and quality of Apalachicola Bay." Accordingly, Florida stated that "the Corps is required to submit a federal consistency determination" in accordance with the CZMA.  In letters dated November 28, 1989 and December 14, 1989, Florida's Department of Natural Resources and Department of Community Affairs, respectively, notified Defendants of the likelihood that the PAC Report and draft Water Control Plan were inconsistent with enforceable policies under Florida's coastal management program, and encouraged Defendants to explore further the impacts of these activities on Florida's coastal resources.  Defendants failed to evaluate the impacts of the proposed reallocation and Water Control Plan on land and water uses in Florida's coastal zone.  Defendants thus failed to comply with the CZMA.  Defendants' actions since that time have had a catastrophic effect on the Apalachicola Bay ecosystem by depriving it of the required minimum of fresh water flow from the Apalachicola River causing death and disease to oyster beds and severely reducing white shrimp, crabs and other marine life in Apalachicola Bay.

161.   Notwithstanding Defendants' failure to comply with the CZMA to determine whether its activities detrimentally affected the coastal zone of Florida, the State of Florida proceeded with its own consistency determination and analysis of the PAC Report and Water Control Plan. In a letter to the Corps dated February 5, 1990, the Florida Department of Environmental Regulation concluded, among other things, that the proposed Reallocation Plan and Water Control Plan were inconsistent with the FCMP pursuant to the CZMA.  The letter further stated that the Water Control Plan failed to recognize the freshwater needs of Apalachicola Bay adequately and to examine effectively or adequately the effects on fish and wildlife resources within Apalachicola

River and Apalachicola Bay.

162.     Defendants failed to respond to Florida's notifications of inconsistency with the FCMP. Although the Corps later withdrew the PAC Report and Reallocation Plan, the Corps has continued to take actions pursuant to the draft Water Control Plan that authorize increasing amounts of water to be reallocated to municipal and industrial uses, similar to the manner contemplated in the PAC Report to which Florida formally objected, and to operate the dams, reservoirs and related facilities of the ACF Basin in the manner set forth herein, such that adverse impacts on the land and water uses, and on natural resources, of Florida's coastal zone  and in particularly to Apalachicola Bay and the City of Apalachicola have continued both in number and severity.

163.     On January 6, 2005, Florida again notified the Corps that its current and proposed reservoir operations were affecting and would affect Florida's coastal resources, specifying the coastal effects of the Corps' operations and the relevant enforceable policies of the FCMP that are recounted in the this Complaint.  Despite Florida's prior and continued objection to the Corps' operation of the dams, reservoirs and related facilities and subsequent notification that the Corps' current and proposed activities require a consistency determination, the Corps has not conducted a consistency determination for these activities and has continued to allow or permit reductions in flow of the ACF system and particularly below the Woodruff Dam on the Apalachicola River and to the Apalachicola Bay at Apalachicola to the point of catastrophic damage and changes to this ecosystem and estuary.

164.     On June 12, 2007, Florida notified the Corps that its operation of dams, reservoirs and related facilities pursuant to the Modified IOP currently affects, and will

continue to affect, land and water use, as well as natural resources, of the coastal zone of the State of Florida and Apalachicola Bay as referenced herein.

165.    Defendants' activities with regard to past, current and proposed operation of the dams, reservoirs and related facilities in the ACF System, including reallocation of water for municipal and industrial uses, constitute final agency activities that have had and will continue to have detrimental effects on the Apalachicola River, the Apalachicola Bay and Estuary (and certainly the City of Apalachicola), and other land, water and natural resources of Florida's coastal zone, and are inconsistent with the enforceable policies of the FCMP.

166.    Defendants' activities described herein are inconsistent with the policies of Florida's water resource statutes, among other statutes.  As stated herein, Defendants' activities directly reduce the freshwater flows of the Apalachicola River and result in: (i) the catastrophic damage, death and elimination of the Apalachicola Bay Ecosystem and estuary including at the present the destruction of some of the largest oyster bars in Apalachicola Bay and the loss of blue crabs, shrimp, finfish, wildlife (and their habitat) and other many God given and created attributes of this natural treasure known by us as Apalachicola Bay:  (ii) the dewatering of significant areas of the floodplain and reduction of habitat for numerous aquatic species in Florida's coastal zone specifically Apalachicola Bay; (iii) adverse impacts on the salinity of the Apalachicola River and Bay that harm aquatic life; and (iv), the reduction of nutrient transport from the ACF Basin to the Apalachicola River, Bay and Estuary in Florida's coastal zone.  Defendants' activities are inconsistent with the enforceable policies of the FCMP in that they fail to promote the availability of sufficient water for all existing and future reasonable beneficial uses and

natural systems; fail to preserve natural resources, fish, and wildlife; and fail to reserve from use water that is necessary for non-withdrawal uses such as protection of fish and wildlife and marine life.

167.   Defendants' activities do not meet Florida's standards for consumptive use.  In addition to the reasons stated above, these activities are contrary to Florida DEP's and the NWFWMD's criteria for reasonable beneficial use, interfere with existing legal uses and are inconsistent with the public interest under Florida law.   Defendants' activities significantly affect Florida's natural systems, including the Apalachicola River and Bay and other floodplain areas that normally would be connected to the River, particularly during periods of drought. Defendants have not adequately considered the significant amount of water that will be withdrawn from Florida's resources and the water quality degradation as a result of their activities. Defendants have not adequately considered the practicality of mitigating any harm by adjusting the quantity or method of water use.

168.   Defendants' activities also do not meet Florida's standards for management and storage of surface waters.  These activities are harmful to the water resources of the Apalachicola River and Bay and therefore are harmful to the City of Apalachicola as referenced above.

169.   Defendants' activities have resulted, and continue to result, in reduced quantity and altered timing of the flows of the ACF System within Florida, thereby violating Florida's enforceable policies which prohibit any person from causing "pollution . . . so as to harm or injure human health or welfare, animal, plant or aquatic life or property."

170.     Because of their adverse impact on oyster, shrimp and blue crab fisheries, among other impacts, Defendants' actions also are inconsistent with the FCMP's enforceable policy of protecting the productivity of marine fisheries.

171.     As a result of Defendants' violation of the CZMA, the City of Apalachicola, its residents, businesses  and natural resources will suffer irreparable harm if Defendants continue to take actions and conduct their activities without providing a "consistency determination" and in a manner that is inconsistent with Florida's coastal management program.

<u>**COUNT ONE**</u>

**Defendants' Unlawful Issuance and Implementation of EDO
to the Modified IOP (November-December 2007**

172.     The City of Apalachicola incorporates by reference all preceding paragraphs.

173.     On or about November and December of 2007, Defendants issued and implemented a drought contingency modification to the modified IOP which it termed the "Exceptional Drought Operations" (EDO) and which included lowering the minimum required flow to 4,250 CFS under certain conditions.

174.     In issuing and implementation of the EDO changes to the Modified IPO of March 2007, Defendants have violated their duty to complete an adequate environmental review prior to taking major federal actions significantly affecting the quality of the environment, as required by NEPA, 42 U.S.C. § 4332(2)(C) and applicable regulations, and have violated their duty to study appropriate alternatives to actions that involve unresolved conflicts over alternative uses of available resources, as required by 42 U.S.

C. § 4332(2)(E) and applicable regulations.

175.    In issuing and implementing the EDO changes to the  Modified IOP, Defendants have made decisions to limit the amounts and timing of releases of water from Jim Woodruff Dam that are needed to support downstream flows for the Apalachicola River species, the Apalachicola Bay ecosystem and estuary and other purposes.  These decisions  constitute final agency actions that are subject to the duties imposed by 42 U.S.C. §§ 4332(2)(C) and (2)(E).

176.    The Corps' November 2007 EA/FONSI for the EDO violates NEPA as it:

a)   Fails to rigorously and objectively evaluate all reasonable alternatives the proposed action;

b)  Fails to fully analyze cumulative impacts of the proposed action which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions;

c)  Improperly defines the purpose and need of the project too narrowly so as to eliminate from consideration a range of reasonable alternatives; and

d)  Improperly relies upon a deficient biological opinion from the FWS to support its finding of no significant impact.

177.    In issuing and implementing the EDO to the  Modified IOP, Defendants have violated the Coastal Zone Management Act, 16 U.S.C. § 1456, by failing to evaluate the effects of its activities on the land and water uses and natural resources in Florida's coastal    zone    and    the    City    of    Apalachicola    and    Apalachicola Bay in particular, failing to prepare and submit a "consistency determination" before final approval and implementation of agency activities, and failing to conduct activities

directly affecting Florida's coastal zone in Apalachicola Bay and the City of Apalachicola in a manner that is, to the maximum extent practicable, consistent with the enforceable policies of Florida's approved coastal management program.

178.   In issuing and implementing the EDO to the Modified IOP, Defendants' activities directly and negatively affect Florida's coastal zone, the City of Apalachicola and Apalachicola Bay in particular.   Defendants have acted inconsistently with and continue to act inconsistently with enforceable policies of the FCMP, including:

a) the general policies of Florida's water resources statutes and WMD objectives;

b) the requirements and criteria governing consumptive use under Chapter 373 and implementing regulations;

c) the requirements and criteria governing management and storage of surface waters under Chapter 373;

d) the authorizations required for submerged lands and aquatic preserves under Chapters 253, 258 and 373;

e) the prohibition of pollution under Chapters 373 and 403; f) protection of marine fisheries under Chapter 370; and

g) protection of species which are endangered, threatened, or of special concern under Chapter 372.

179.   These actions injure the City of Apalachicola and Apalachicola Bay by reducing the quantity and altering the timing of flows of the ACF System within Florida and to Apalachicola Bay, undermining the Congressionally-authorized purposes of Lake Lanier, and degrading the ecological conditions that are crucial to protection and existence of the unique water-dependent biological and economical community in the

Apalachicola River and Apalachicola Bay and Estuary at Apalachicola.

180.    This Court may hold unlawful and set aside Defendants' actions giving rise to this  Count One  pursuant to 5 U.S.C. §§ 706(2)(A), (C), and (D).

## COUNT TWO

### Defendants' Unlawful Issuance and Implementation of the Modified IOP

181.    City of Apalachicola incorporates by reference all preceding paragraphs.

182.    On or about March 2007, Defendants issued and implemented the Modified through the March 2007 EA/FONSI.

183.    In issuing and implementing the Modified IOP,  Defendants have violated their duty to complete an adequate environmental review prior to taking major federal actions significantly affecting the quality of the environment, as required by NEPA, 42 U.S.C. § 4332(2)(C) and applicable regulations, and have violated their duty to study appropriate alternatives to actions that involve unresolved conflicts over alternative uses of available resources, as required by 42 U.S.C. § 4332(2)(E) and applicable regulations.

184.    In issuing and implementing the Modified IOP, Defendants have made decisions to limit the amounts and timing of releases of water from Jim Woodruff Dam that are needed to support downstream flows for the Apalachicola River Species, the Apalachicola Bay Ecosystem and estuary and other purposes. These decisions constitute final agency actions that are subject to the duties imposed by 42 U.S.C. §§ 4332(2)(C) and (2)(E).

185.    The Corps' March 2007 EA/FONSI for the modified violates NEPA as it:

(a) Fails to rigorously explore and objectively evaluate all reasonable alternatives to the proposed action;

b) Fails to fully analyze cumulative impacts of the proposed action which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions;

c) Improperly defines the purpose and need of the project too narrowly so as to eliminate from consideration a range of reasonable alternatives; and

d) Improperly relies upon a deficient biological opinion from the FWS to support its finding of no significant impact.

186.   In issuing and implementing the Modified IOP, Defendants have violated the Coastal Zone Management Act, 16 U.S.C. § 1456, by failing to evaluate the effects of its activities on the land and water uses and natural resources in Florida's coastal zone and  (Apalachicola Bay and the City of Apalachicola in particular), failing to prepare and submit a "consistency determination" before final approval and implementation of agency activities, and failing to conduct activities directly affecting Florida's coastal zone in Apalachicola Bay and the City of Apalachicola a manner that is, to the maximum extent practicable, consistent with the enforceable policies of Florida's approved coastal management program.

187.   In issuing and implementing the Modified IOP, Defendants' activities directly and negatively affect Florida's coastal zone the City of Apalachicola and Apalachicola Bay in particular and are inconsistent with enforceable policies of the FCMP. Defendants have acted inconsistently with and continue to act inconsistently with enforceable policies of the FCMP, including:

a) the general policies of Florida's water resources statutes and WMD objectives;

b) the requirements and criteria governing consumptive use under Chapter 373 and implementing regulations;

c) the requirements and criteria governing management and storage of surface waters under Chapter 373;

d) the authorizations required for submerged lands and aquatic preserves under Chapters 253, 258 and 373;

e) the prohibition of pollution under Chapters 373 and 403; f) protection of marine fisheries under Chapter 370; and

g) protection of species which are endangered, threatened, or of special concern under Chapter 372.

188.   These actions injured Florida and in particular the City of Apalachicola and Apalachicola Bay by reducing the quantity and altering the timing of flows of the ACF System within Florida and to Apalachicola Bay, undermining the Congressionally-authorized purposes of Lake Lanier, and degrading the ecological conditions that are crucial to protection and existence of the unique water-dependent biological and economical community in the Apalachicola River and Apalachicola Bay and Estuary at Apalachicola.

189.   This Court may hold unlawful and set aside Defendants' actions giving rise to this Count Nine pursuant to 5 U.S.C. §§ 706(2)(A), (C), and (D).

## COUNT THREE`

### Defendants' Unlawful Issuance and Implementation of the Original IOP

190.   City of Apalachicola incorporates by reference all preceding paragraphs.

191.   On or about October 2006, Defendants issued and implemented the original IOP through the October 2006 EA/FONSI.

192.   In issuing and implementing the original IOP,  Defendants have violated their duty to complete an adequate environmental review prior to taking major federal actions significantly affecting the quality of the environment, as required by NEPA, 42 U.S.C. § 4332(2)(C) and applicable regulations, and have violated their duty to study appropriate alternatives to actions that involve unresolved conflicts over alternative uses of available resources, as required by 42 U.S.C. § 4332(2)(E) and applicable regulations.

193.   In issuing and implementing the original IOP, Defendants have made decisions to limit the amounts and timing of releases of water from Jim Woodruff Dam that are needed to support downstream flows for the Apalachicola River Species, the Apalachicola Bay Ecosystem and estuary the City of Apalachicola and other purposes. These decisions constitute final agency actions that are subject to the duties imposed by 42 U.S.C. §§ 4332(2)(C) and (2)(E).

194.   The Corps' October 2006 EA/FONSI for the original IOP violates NEPA, as it:

a)  Fails to rigorously explore and objectively evaluate all alternatives to the reasonable proposed action;

b)  Fails to fully analyze cumulative impacts of the proposed action which result from the incremental impact of the action when added to other past,

present, and reasonably foreseeable future actions;

c) Improperly defines the purpose and need of the project too narrowly so as to eliminate from consideration a range of reasonable alternatives; and

d) Improperly relies upon a deficient biological opinion from the FWS to support its finding of no significant impact.

195.    In issuing and implementing the original IOP, Defendants have violated the Coastal Zone Management Act, 16 U.S.C. § 1456, by failing to evaluate the effects of its activities on the land and water uses and natural resources in Florida's coastal zone and the City of Apalachicola and Apalachicola Bay in particular, failing to prepare and submit a "consistency determination" before final approval and implementation of agency activities, and failing to conduct activities directly affecting Florida's coastal zone, Apalachicola Bay and the City of Apalachicola in a manner that is, to the maximum extent practicable, consistent with the enforceable policies of Florida's approved coastal management program.

196.    In issuing and implementing the original IOP, Defendants' activities directly and negatively affect Florida's coastal zone, the City of Apalachicola and Apalachicola Bay in particular and are inconsistent with enforceable policies of the FCMP. Defendants have acted inconsistently with and continue to act inconsistently with enforceable policies of the FCMP, including:

a) the general policies of Florida's water resources statutes and WMD objectives;

(b) the requirements and criteria governing consumptive use under Chapter 373 and implementing regulations;

(c) the requirements and criteria governing management and storage of surface waters under Chapter 373;

(d) the authorizations required for submerged lands and aquatic preserves under Chapters 253, 258 and 373;

(e) the prohibition of pollution under Chapters 373 and 403;

(f) protection of marine fisheries under Chapter 370; and

(g) protection of species which are endangered, threatened, or of special concern under Chapter 372.

197.    These actions injure Florida and in particular the City of Apalachicola and Apalachicola Bay by reducing the quantity and altering the timing of flows of the ACF System within Florida and to Apalachicola Bay, undermining the Congressionally-authorized purposes of Lake Lanier, and degrading the ecological conditions that are crucial to protection and existence of the unique water-dependent biological and economical community in the Apalachicola River and Apalachicola Bay and Estuary at Apalachicola.

198.    This Court may hold unlawful and set aside Defendants' actions giving rise to this Count Eight pursuant to 5 U.S.C. §§ 706(2)(A), (C), and (D).

## COUNT FOUR

### Defendants' Unlawful Execution of the Gainesville Contract

199.    The City of Apalachicola incorporates by reference all preceding paragraphs.

200.    Defendants executed the Gainesville contract authorizing the withdrawal and use of water from Lake Lanier for municipal and industrial purposes, as described in

Paragraph 113, above.

201.    In executing the Gainesville contract, Defendants violated their obligation to operate Lake Lanier in accordance with the Congressionally-authorized purposes of the project, the requirements of 33 U.S.C. § 709, and the requirements of their own regulations.  Defendants have exceeded their authority by taking this action, without Congressional approval, because it makes material changes in project operations, substantially alters the balance of project purposes, materially alters the nature of the project, adds project purposes not otherwise authorized by law, and substantially changes the relative size of project purposes.

202.    In executing the Gainesville contract, Defendants violated the Water Supply Act of 1958, 43 U.S.C. § 390b(d), by modifying the Lake Lanier project, without approval from Congress, to include storage for municipal and industrial water supply purposes, and in so doing have seriously affected, and will continue to seriously affect, the purposes for which the project was authorized, surveyed, planned, or constructed, and have made modifications that involved, and will continue to involve, major operational changes.

203.    In executing the Gainesville contract, Defendants violated the Flood Control Act of 1944, 33 U.S.C. § 708, and the regulations promulgated thereunder by making a contract for domestic and industrial uses of the water from Lake Lanier that is not surplus water, which contract has adversely affected, and will continue to adversely affect, existing lawful uses of such water. Defendants made such contract without classifying any water in Lake Lanier as surplus water, without issuing any surplus water reports or undertaking the analyses required in such reports, and without obtaining the

views of affected States.  Defendants made such contract for larger amounts of water and for longer periods of time than are authorized by law.

204.   In executing the Gainesville contract, Defendants violated their duty to provide an opportunity for public review and comment, and to coordinate with affected states and municipalities, including Florida and the City of Apalachicola, as required by 33 U.S.C. §§ 2312, 2319, and applicable regulations.

205.   In executing the Gainesville contract, Defendants violated their duty to complete an environmental review, including the preparation of an environmental impact statement in accordance with lawful procedures for public involvement, prior to taking major federal actions significantly affecting the quality of the environment, as required by NEPA, 42 U.S.C. § 4332(2)(C) and applicable regulations, and have violated their duty to study appropriate alternatives to actions that involve unresolved conflicts over alternative uses of available resources, as required by 42 U.S.C. § 4332(2)(E) and applicable regulations.

206.   In executing the Gainesville contract, Defendants failed to consult with the FWS in violation of the procedural requirements of Section 7 of the ESA.

207.   In executing the Gainesville contract, Defendants' actions injured the City of Apalachicola  by reducing the quantity and altering the timing of flows of the ACF System within Florida to Apalachicola Bay, the natural receiving organism for this fresh water flow, undermining the Congressionally-authorized purposes of Lake Lanier, and degrading the ecological conditions that are crucial to protection of the unique water-dependent biological community in the Apalachicola River and Apalachicola Bay and Estuary.

208.    This Court may hold unlawful and set aside Defendants' actions giving rise to this Count One pursuant to 5 U.S.C. §§ 706(2)(A), (C) and (D).

## COUNT FIVE

### Defendants' Unlawful Continuation of a "Holdover" Contract with the City of Cumming, Georgia

209.    The City of Apalachicola incorporates by reference all preceding paragraphs.

210.    On expiration of the term of the contract with the City of Cumming, Georgia, described in Paragraphs, Defendants continued such contract in effect as a "holdover" contract, continuing substantially identical terms as the contract prior to expiration, except that such a "holdover" contract was or may have become terminable at will by Defendants.  Defendants' decision to continue authorization of water withdrawals pursuant to such contract constitutes final agency action.  Alternatively, if after expiration such contract should be deemed to have terminated, then it is an oral contract or license, privilege or relief under which Defendants have decided to continue to authorize the withdrawal, release and use of water from Lake Lanier for municipal and industrial purposes, as described in Paragraph 140, thereby also constituting final agency action as to each such authorized withdrawal, release or use. These actions constitute, individually and in the aggregate, a *de facto* reallocation of storage in Lake Lanier.

211.    In continuing a "holdover" contract with the City of Cumming, Georgia, Defendants violated their obligation to operate Lake Lanier in accordance with the Congressionally-authorized purposes of the project, the requirements of 33 U.S.C. § 709, and the requirements of their own regulations.  Defendants have exceeded their authority

by taking this action, without Congressional approval, because it makes material changes in project operations, substantially alters the balance of project purposes, materially alters the nature of the project, adds project purposes not otherwise authorized by law, and substantially changes the relative size of project purposes.

212.    In continuing a "holdover" contract with the City of Cumming, Georgia, Defendants have violated the Water Supply Act of 1958, 43 U.S.C. § 390b(d), by modifying the Lake Lanier project, without approval from Congress, to include storage for municipal and industrial water supply purposes, and in so doing have seriously affected, and will continue to seriously affect, the purposes for which the project was authorized, surveyed, planned, or constructed, and have made modifications that involved, and will continue to involve, major operational changes.

213.    In continuing a "holdover" contract with the City of Cumming, Georgia, Defendants have violated the Flood Control Act of 1944, 33 U.S.C. § 708, and the regulations promulgated thereunder by making a contract for domestic and industrial uses of the water in Lake Lanier that is not surplus water, which contract has adversely affected, and will continue to adversely affect, existing lawful uses of such water. Defendants have made such contract without classifying any water in Lake Lanier as surplus water, without issuing any surplus water reports, and without obtaining the views of affected States.  Defendants have made such contract for larger amounts of water and for longer periods of time than are authorized by law.

214.    In continuing a "holdover" contract with the City of Cumming, Georgia, Defendants have violated their duty to provide an opportunity for public review and comment, and to coordinate with affected states and local agencies and the City of

Apalachicola, Florida, including Florida, as required by 33 U.S.C. §§ 2312, 2319, and applicable regulations.

215.    In continuing a "holdover" contract with the City of Cumming, Georgia, Defendants have violated their duty to complete an environmental review, including the preparation of an environmental impact statement in accordance with lawful procedures for public involvement, prior to taking major federal actions significantly affecting the quality of the environment, as required by NEPA, 42 U.S.C. § 4332(2)(C) and applicable regulations, and have violated their duty to study appropriate alternatives to actions that involve unresolved conflicts over alternative uses of available resources, as required by 42 U.S.C. § 4332(2)(E) and applicable regulations.

216.    In continuing a "holdover" contract with the City of Cumming, Georgia, Defendants have violated the Coastal Zone Management Act, 16 U.S.C. § 1456, by failing to evaluate the effects of their activities on the land and water uses and natural resources in Florida's coastal zone and the City of Apalachicola and Apalachicola Bay, by failing to prepare and submit to Florida a "consistency determination" before final approval of agency activities, by failing to respond to Florida and its notifications of inconsistency with the FCMP, and by  failing to conduct activities directly affecting Florida's coastal zone and Apalachicola Bay and the City of Apalachicola in a manner that is, to the maximum extent practicable, consistent with the enforceable policies of Florida's approved coastal management program.

217.    In continuing a "holdover" contract with the City of Cumming, Georgia, Defendants failed to consult with the FWS in violation of the procedural requirements of Section 7 of the ESA.

218.     These actions injure Florida and the City of Apalachicola in particularly reducing the quantity and altering the timing of flows of the ACF System within Florida and particularly to Apalachicola Bay, seriously affecting the Congressionally-authorized purposes of Lake Lanier, and degrading the ecological conditions that are crucial to protection  and existence of the unique water-dependent biological and economical community in the Apalachicola River and Apalachicola Bay and Estuary at Apalachicola, Florida.

219.     This Court may hold unlawful and set aside the Defendants' actions giving rise to this Count Two pursuant to 5 U.S.C. §§ 706(2)(A), (C), and (D).

## COUNT  SIX

### Defendants' Unlawful Continuation of a "Holdover" Contract with Gwinnett County, Georgia

220.     City of Apalachicola incorporates by reference all preceding paragraphs.

221.     On expiration of the term of the contract with Gwinnett County, Georgia, described in Paragraphs 117, Defendants continued such contract in effect as a "holdover" contract, continuing substantially identical terms as the contract prior to expiration, except that such a "holdover" contract was or may have become terminable at will by Defendants.  Defendants' decision to continue authorization of water withdrawals pursuant to such contract constitutes final agency action.  Alternatively, if after expiration such contract should be deemed to have terminated, then it is an oral contract or license, privilege or relief under which Defendants have decided to continue to authorize the withdrawal, release and use of water from Lake Lanier for municipal and industrial purposes, as described in Paragraph 140, thereby also constituting final agency action as

to each such authorized withdrawal, release or use. These actions constitute, individually and in the aggregate, a *de facto* reallocation of storage in Lake Lanier.

222.   In continuing a "holdover" contract with Gwinnett County, Georgia, Defendants violated their obligation to operate Lake Lanier in accordance with the Congressionally-authorized purposes of the project, the requirements of 33 U.S.C. § 709, and the requirements of their own regulations.  Defendants have exceeded their authority by taking this action, without Congressional approval, because it makes material changes in project operations, substantially alters the balance of project purposes, materially alters the nature of the project, adds project purposes not otherwise authorized by law, and substantially changes the relative size of project purposes.

223.   In continuing a "holdover" contract with Gwinnett County, Georgia, Defendants have violated the Water Supply Act of 1958, 43 U.S.C. § 390b(d), by modifying the Lake Lanier project, without approval from Congress, to include storage for municipal and industrial water supply purposes, and in so doing have seriously affected, and will continue to seriously affect, the purposes for which the project was authorized, surveyed, planned, or constructed, and have made modifications that involved, and will continue to involve, major operational changes.

224.   In continuing a "holdover" contract with Gwinnett County, Georgia, Defendants have violated the Flood Control Act of 1944, 33 U.S.C. § 708, and the regulations promulgated thereunder by making a contract for domestic and industrial uses of the water in Lake Lanier that is not surplus water, which contract has adversely affected, and will continue to adversely affect, existing lawful uses of such water. Defendants have made such contract without classifying any water in Lake Lanier as

surplus water, without issuing any surplus water reports, and without obtaining the views of affected States. Defendants have made such contract for larger amounts of water and for longer periods of time than are authorized by law.

225.   In continuing a "holdover" contract with Gwinnett County, Georgia, Defendants have violated their duty to provide an opportunity for public review and comment, and to coordinate with affected states and local agencies, including Florida and the City of Apalachicola, as required by 33 U.S.C. §§ 2312, 2319, and applicable regulations.

226.   In continuing a "holdover" contract with Gwinnett County, Georgia, Defendants have violated their duty to complete an environmental review, including the preparation of an environmental impact statement in accordance with lawful procedures for public involvement, prior to taking major federal actions significantly affecting the quality of the environment, as required by NEPA, 42 U.S.C. § 4332(2)(C) and applicable regulations, and have violated their duty to study appropriate alternatives to actions that involve unresolved conflicts over alternative uses of available resources, as required by 42 U.S.C. § 4332(2)(E) and applicable regulations.

227.   In continuing a "holdover" contract with Gwinnett County, Georgia, Defendants have violated the Coastal Zone Management Act, 16 U.S.C. § 1456, by failing to evaluate the effects of their activities on the land and water uses and natural resources in Florida's coastal zone including particularly the City of Apalachicola and Apalachicola Bay, failing to prepare and submit to Florida a "consistency determination" before final approval of agency activities, failing to respond to Florida and its notifications of inconsistency with the FCMP, and failing to conduct activities directly

affecting Florida's coastal zone, Apalachicola Bay and the City of Apalachicola in a manner that is, to the maximum extent practicable, consistent with the enforceable policies of Florida's approved coastal management program.

228.    In continuing a "holdover" contract with Gwinnett County, Georgia, Defendants failed to consult with the FWS in violation of the procedural requirements of Section 7 of the ESA.

229.    These actions injure Florida and the City of Apalachicola in particular by reducing the quantity and altering the timing of flows of the ACF System within Florida and to Apalachicola Bay, seriously affecting the Congressionally-authorized purposes of Lake Lanier, and degrading the ecological conditions that are crucial to protection and existence of the unique water-dependent biological and economical community in the Apalachicola River and Apalachicola Bay and Estuary at Apalachicola.

230.    This Court may hold unlawful and set aside the Defendants' actions giving rise to this Count Three pursuant to 5 U.S.C. §§ 706(2)(A), (C), and (D).

## COUNT SEVEN

### Defendants' Unlawful Continuation of a "Holdover" Contract with ARC

231.    City of Apalachicola incorporates by reference all preceding paragraphs.

232.    On expiration of the term of the contract with ARC, described in Paragraphs 119-120, Defendants continued such contract in effect as a "holdover" contract, continuing substantially identical terms as the contract prior to expiration, except that such a "holdover" contract was or may have become terminable at will by Defendants.    Defendants' decision to continue authorization of water withdrawals

pursuant to such contract constitutes final agency action. Alternatively, if after expiration such contract should be deemed to have terminated, then it is an oral contract or license, privilege or relief under which Defendants have decided to continue to authorize the withdrawal, release and use of water from Lake Lanier for municipal and industrial purposes, as described in Paragraph 140, thereby also constituting final agency action as to each such authorized withdrawal, release or use. These actions constitute, individually and in the aggregate, a *de facto* reallocation of storage in Lake Lanier.

233.    In continuing a "holdover" contract with ARC, Defendants violated their obligation to operate Lake Lanier in accordance with the Congressionally-authorized purposes of the project, the requirements of 33 U.S.C. § 709, and the requirements of their own regulations. Defendants have exceeded their authority by taking this action, without Congressional approval, because it makes material changes in project operations, substantially alters the balance of project purposes, materially alters the nature of the project, adds project purposes not otherwise authorized by law, and substantially changes the relative size of project purposes.

234.    In continuing a "holdover" contract with ARC, Defendants have violated the Water Supply Act of 1958, 43 U.S.C. § 390b(d), by modifying the Lake Lanier project, without approval from Congress, to include storage for municipal and industrial water supply purposes, and in so doing have seriously affected, and will continue to seriously affect, the purposes for which the project was authorized, surveyed, planned, or constructed, and have made modifications that involved, and will continue to involve, major operational changes.

235.    In continuing a "holdover" contract with ARC, Defendants have violated

the Flood Control Act of 1944, 33 U.S.C. § 708, and the regulations promulgated thereunder by making a contract for domestic and industrial uses of the water in Lake Lanier that is not surplus water, which contract has adversely affected, and will continue to adversely affect, existing lawful uses of such water.  Defendants have made such contract without classifying any water in Lake Lanier as surplus water, without issuing any surplus water reports, and without obtaining the views of affected States.  Defendants have made such contract for larger amounts of water and for longer periods of time than are authorized by law.

236.    In continuing a "holdover" contract with ARC, Defendants have violated their duty to provide an opportunity for public review and comment, and to coordinate with affected states and local agencies, including Florida and the City of Apalachicola, as required by 33 U.S.C. §§ 2312, 2319, and applicable regulations.

237.    In continuing a "holdover" contract with ARC, Defendants have violated their duty to complete an environmental review, including the preparation of an environmental impact statement in accordance with lawful procedures for public involvement, prior to taking major federal actions significantly affecting the quality of the environment, as required by NEPA, 42 U.S.C. § 4332(2)(C) and applicable regulations, and have violated their duty to study appropriate alternatives to actions that involve unresolved conflicts over alternative uses of available resources, as required by 42 U.S.C. § 4332(2)(E) and applicable regulations.

238.    In continuing a "holdover" contract with ARC, Defendants have violated the Coastal Zone Management Act, 16 U.S.C. § 1456, by failing to evaluate the effects of their activities on the land and water uses and natural resources in Florida's coastal zone,

including particularly the City of Apalachicola and Apalachicola Bay failing to prepare and submit to Florida a "consistency determination" before final approval of agency activities, failing to respond to Florida and its notifications of inconsistency with the FCMP, and failing to conduct activities directly affecting Florida's coastal zone Apalachicola Bay and the City of Apalachicola in a manner that is, to the maximum extent practicable, consistent with the enforceable policies of Florida's approved coastal management program.

239.    In continuing a "holdover" contract with ARC, Defendants failed to consult with the FWS in violation of the procedural requirements of Section 7 of the ESA.

240.    These actions injure Florida and the City of Apalachicola in particular by reducing the quantity and altering the timing of flows of the ACF System within Florida and to Apalachicola Bay, seriously affecting the Congressionally-authorized purposes of Lake Lanier, and degrading the ecological conditions that are crucial to protection and existence of the unique water-dependent biological and economical community in the Apalachicola River and Apalachicola Bay and Estuary at Apalachicola.

241.    This Court may hold unlawful and set aside the Defendants' actions giving rise to this Count Four pursuant to 5 U.S.C. §§ 706(2)(A), (C), and (D).

## COUNT EIGHT

## Defendants' Unlawful Issuance and Implementation of the Draft ACF Water Control Plan

242.    City of Apalachicola incorporates by reference all preceding paragraphs.

243.    On or about October, 1989, Defendants issued, revised and implemented the draft ACF Water Control Plan, which fails to conform with Congressional authorizing legislation for ACF System projects, failed to adhere to the 1958 *Regulation Manual*, as described in Paragraphs 123-131, and failed to comply with federal procedural and coordination requirements, as described in Paragraph 124.

244.    Defendants issued and implemented the draft Water Control Plan to manage the storage and release of water from ACF Basin reservoirs in a manner that supports recreational uses of the reservoirs and propagation of non-native fish at the expense of authorized project purposes and to the detriment of protected species in the Apalachicola River, as described in Paragraphs 141-146.

245.    Defendants issued and implemented the draft Water Control Plan to manage the storage and release of water from ACF Basin reservoirs in a manner that supports navigation in the Apalachicola River, as described in Paragraphs 148-149.

246.    In issuing and implementing the draft Water Control Plan, Defendants violated their obligation to operate Lake Lanier in accordance with the Congressionally-authorized purposes of the project, the requirements of 33 U.S.C. § 709, and the requirements of their own regulations. Defendants have exceeded their authority by taking this action, without Congressional approval, because it makes material changes in project operations, substantially alters the balance of project purposes, materially alters the nature of the project, adds project purposes not otherwise authorized by law, and substantially changes the relative size of project purposes.

247.    In issuing and implementing the draft Water Control Plan, Defendants have violated their duty to provide an opportunity for public review and comment, and to

coordinate with affected states and local agencies, including Florida and the City of Apalachicola, as required by 33 U.S.C. §§ 2312, 2319, and applicable regulations.

248.    In issuing and implementing the draft Water Control Plan, Defendants have violated the Water Supply Act of 1958, 43 U.S.C. § 390b(d), by modifying the Lake Lanier project, without approval from Congress, to include storage for municipal and industrial water supply purposes, and in so doing have seriously affected, and will continue to seriously affect, the purposes for which the project was authorized, surveyed, planned, or constructed, and have made modifications that involved, and will continue to involve, major operational changes.

249.    In issuing and implementing the draft Water Control Plan, Defendants have violated their duty to prepare and implement lawful water control plans for the projects within the ACF System, including for Lake Lanier, that comply with 33 U.S.C. § 709 and applicable regulations, conform with the Congressional authorizing legislation and meet the functional objectives of the projects, and that reflect coordination with all affected states and other interests including the City of Apalachicola, as required by law and applicable regulations, 33 C.F.R. § 222.5.

250.    In issuing and implementing the draft Water Control Plan, Defendants have violated their duty to complete an environmental review, including the preparation of an environmental impact statement in accordance with lawful procedures for public involvement, prior to taking major federal actions significantly affecting the quality of the environment, as required by NEPA, 42 U.S.C. § 4332(2)(C) and applicable regulations, and have violated their duty to study appropriate alternatives to actions that involve unresolved conflicts over alternative uses of available resources, as required by

42 U.S.C. § 4332(2)(E) and applicable regulations.

251.   In issuing and implementing the draft Water Control Plan, Defendants have violated the Coastal Zone Management Act, 16 U.S.C. § 1456, by failing to evaluate the effects of their activities on the land and water uses and natural resources in Florida's coastal zone including particularly the City of Apalachicola and Apalachicola Bay, failing to prepare and submit to Florida a "consistency determination" before final approval of agency activities, failing to respond to Florida and its notifications of inconsistency with the FCMP, and failing to conduct activities directly affecting Florida's coastal zone, Apalachicola Bay and the City of Apalachicola  in a manner that is, to the maximum extent practicable, consistent with the enforceable policies of Florida's approved coastal management program.

252.   In issuing and implementing the draft Water Control Plan, Defendants failed to consult with the FWS in violation of the procedural requirements of Section 7 of the ESA.

253.   This action injured Florida and the City of Apalachicola in particular by reducing the quantity and altering the timing of flows of the ACF System within Florida and to Apalachicola Bay, seriously affecting the Congressionally-authorized purposes of Lake Lanier, and degrading the ecological conditions that are crucial to protection and existence of the unique water-dependent biological and economical community in the Apalachicola River and Apalachicola Bay and Estuary at Apalachicola.

254.   This Court may hold unlawful and set aside the Defendants' actions giving rise to this Count Six pursuant to 5 U.S.C. §§ 706(2)(A), (C), and (D).

## COUNT NINE

**Defendants' Unlawful Issuance and Implementation of Division Regulation DR
1130-2-16 on March 30, 2001**

255.     City of Apalachicola incorporates by reference all preceding paragraphs.

Defendants issued and implemented division regulation DR 1130-2-16 on March
30, 2001, as described in Paragraph 144.

256.     In issuing and implementing division regulation DR 1130-2-16 on March
30, 2001, Defendants violated their obligation to operate Lake Lanier in accordance with
the Congressionally-authorized purposes of the project, the requirements of 33 U.S.C. §
709, and the requirements of their own regulations.  Defendants have exceeded their
authority by taking this action, without Congressional approval, because it makes
material changes in project operations, substantially alters the balance of project
purposes, materially alters the nature of the project, adds project purposes not otherwise
authorized by law, and substantially changes the relative size of project purposes.

257.     In issuing and implementing division regulation DR 1130-2-16 on March
30, 2001, Defendants have violated their duty to provide an opportunity for public review
and comment, and to coordinate with affected states and local agencies and the City of
Apalachicola, including Florida, as required by 33 U.S.C. §§ 2312, 2319, and applicable
regulations.

258.     In issuing and implementing division regulation DR 1130-2-16 on March
30, 2001, Defendants have violated their duty to complete an environmental review,
including the preparation of an environmental impact statement in accordance with
lawful procedures for public involvement, prior to taking major federal actions
significantly affecting the quality of the environment, as required by NEPA, 42 U.S.C. §
4332(2)(C) and applicable regulations, and have violated their duty to study appropriate

alternatives to actions that involve unresolved conflicts over alternative uses of available resources, as required by 42 U.S.C. § 4332(2)(E) and applicable regulations.

259.   In issuing and implementing division regulation DR 1130-2-16 on March 30, 2001, Defendants have violated the Coastal Zone Management Act, 16 U.S.C. § 1456, by failing to evaluate the effects of their activities on the land and water uses and natural resources in Florida's coastal zone and in particular the City of Apalachicola and Apalachicola Bay, failing to prepare and submit to Florida a "consistency determination" before final approval of agency activities, failing to respond to Florida and its notifications of inconsistency with the FCMP, and failing to conduct activities directly affecting Florida's coastal zone and in particular the City of Apalachicola and Apalachicola Bay in a manner that is, to the maximum extent practicable, consistent with the enforceable policies of Florida's approved coastal management program.

260.   In issuing and implementing division regulation DR 1130-2-16 on March 30, 2001, Defendants failed to consult with the FWS in violation of the procedural requirements of Section 7 of the ESA.

261.   This action injured Florida and the City of Apalachicola in particular by reducing the quantity and altering the timing of flows of the ACF System within Florida and to Apalachicola Bay, seriously affecting the Congressionally-authorized purposes of Lake Lanier, and degrading the ecological conditions that are crucial to protection and existence of the unique water-dependent biological and economical community in the Apalachicola River and Apalachicola Bay and Estuary at Apalachicola Bay, by reducing the quantity and altering the timing of flows of the ACF System within Florida and to Apalachicola Bay, undermining the Congressionally authorized purposes of Lake Lanier,

and degrading the ecological conditions that are crucial to protection and existence of the unique water-dependent and biological and economical community in the Apalachicola River and Apalachicola Bay and Estuary at Apalachicola.

262.    This Court may hold unlawful and set aside Defendants' actions giving rise to this Count Eight pursuant to 5 U.S.C. §§ 706(2)(A),(C) and (D).

RELIEF REQUESTED

Based on the foregoing paragraphs 1 through 281, which are incorporated here by reference, City of Apalachicola requests the following relief:

A.    That this Court declare unlawful and set aside:

(i)    Defendants' November 2007 issuance and implementation of the drought contingency modification to the Modified IOP termed the "Exceptional Drought Operations" (EDO) which included lowering the minimum required flow to 4,250 CFS under certain conditions and any EA/FONSI associated therewith.

(ii)    Defendants' March 2007 EA/FONSI for the Modified IOP; and

(iii)    Defendants" October 2006 EA/FONSI for the original IOP:

(iv)    Defendants' approval of and entry into the Supplemental Agreement to Relocation Contract between the United States of America and the City of Gainesville for Withdrawal of Water from Lake Sidney Lanier, Georgia

(v)    Defendants' "holdover" contract with the City of Cumming, Georgia;

(vi)    Defendants' "holdover" contract with Gwinnett County, Georgia;

(vii)    Defendants' "holdover" contract with ARC;

(viii)    Defendants' draft ACF Water Control Plan;

(ix)    Defendants' division regulation DR 1130-2-16;

(x)     Defendants' "action zones";

(xi)    Defendants' failure to formally consult, pursuant to Section 7 of the ESA, on the activities and operations identified herein;

(xii)   The Corps' ongoing, discretionary reservoir operations that are unlawfully jeopardizing the continued existence of the Gulf sturgeon and the Apalachicola Bay ecosystem and estuary including its oysters, shrimp, crabs and other marine life, unlawfully taking members of those species, and adversely affecting, modifying or destroying habitat designated as critical for those species;

(xiv)   Defendants' failure to prepare and submit to Florida a "consistency determination" under the CZMA for the agency activities identified herein, and Defendants' actions which are inconsistent to the FCMP;

B.      That this court permanently enjoin the Defendants:

(iv)    From reallocating storage  in or authorizing withdrawals and releases from Lake Lanier for municipal and industrial purposes without further Congressional authorization;  legislation, and to comply fully with NEPA prior to proceeding with the IOP and modifications to the IO;

(v)     From reallocating storage in Corps facilities in the ACF system for recreational purposes without further Congressional authorization, and from retaining in storage for the benefit of recreation water that is stored for authorized purposes;

(vi)    From performing any obligation arising under the Supplemental Agreement to Relocation Contract between the United States of  America and the City of Gainesville for Withdrawal of Water from

Lake Lanier, Georgia;

(vii)    To consult and coordinate fully with Florida and the public

regarding any reallocation of storage in Lake Lanier and any authorization

for withdrawals or releases of water from Lake Lanier for municipal

and industrial purposes;

(viii)    To develop and implement, within a reasonable period, a schedule that, to

the greatest extend possible, returns the management of the ACF System,

including withdrawals and releases from Lake Lanier, to

their condition preceding the "live and let live" provisions of the

1992 MOA among Florida, Alabama and Georgia that terminated in

August  2003, or to otherwise minimize the impact of such withdrawals

and releases;

(ix)    To comply fully with NEPA prior to proceeding with any

proposed action relating to the ACF System falling within the scope of

that law;

(x)    To initiate formal consultation with the Service and/or NOAA Fisheries

pursuant to Section 7 of the ESA on the activities identified herein and to

refrain from making any irreversible or irretrievable commitment of

resources pending completion of such consultation;

(i)    To release adequate flows into the ACF System to ensure that Gulf

sturgeon and the Apalachicola Bay ecosystem and estuary including its

oysters, shrimp, crabs and other marine life will not be jeopardized or

taken and that designated critical habitat will not be adversely modified or

destroyed; and,

(ii)      To evaluate the effects of agency activities on the land and water uses and natural resources in Florida's coastal zone and specifically Apalachicola Bay.

(iii)     From conducting any agency activities within the ACF System in a manner inconsistent with Florida's coastal management program and specifically Apalachicola Bay or without preparing and submitting to Florida a "consistency determination" under the CZMA.


C.      That this Court grant the City of Apalachicola its attorneys' fees, expert witness fees and costs as allowed by law; and


D.      That this Court grant such other relief as it deems appropriate.


Respectfully submitted this 30th  day of April  2008.

Attorney for Plaintiff
City of Apalachicola, Florida
J. Patrick Floyd
Law Offices J. Patrick Floyd, Chtd.
Florida Bar No.:  257001
20 Avenue D
Apalachicola, Florida  32320
(850) 653-2709


_____

J. Patrick Floyd

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 30th day of April, 2008, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, and was served upon counsel of record and all parties to this proceeding by electronic notification or by depositing copies thereof in the United States Mail, postage prepaid, properly addressed to:

**ATTORNEYS FOR FEDERAL DEFENDANTS**

James A. Maysonett
Jennifer L. Allaire
United States Department of Justice
Environment and Natural Resources Division
General Litigation Section
Benjamin Franklin Station, P.O. Box 4390
601 D. Street, NW
Washington, D.C.  20044-7397

Ruth Ann Storey
United States Department of Justice
General Litigation Section
Benjamin Franklin Station
P.O. Box 663
Washington, D.C.  20044

Sharon D. Simmons
Alice H. Martin
U.S. Attorney's Office
1801 4th Avenue North
Birmingham, Alabama  35203-2101

Joseph A. Gonzales
Deborah Shoemake
U.S. Army Corps of Engineers
109 St. Joseph Street
P.O. Box 2288
Mobile, Alabama  36601

Julia B. Anderson
Stephen H. McClain
Mary Christine Roemer
U.S. Attorney's Office
Northern District of Georgia
75 Spring Street, SW
600 United States Courthouse
Atlanta, Georgia  30303

Brendan F. Flanagan
U.S. Attorney's Office
Middle District of Georgia
1246 First Avenue
P.O. Box 2568
Columbus, Georgia 31902

**ATTORNEYS FOR STATE OF ALABAMA**

Matthew H. Lembke
Joel M. Kuehnert
Bradley Arant, Rose & White, LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama  35203

William S. Cox, III
W. Larkin Radney, IV
Haley A. Andrews
Lightfoot, Franklin & White, LLC
The Clark Building
400 North 20th Street
Birmingham, Alabama  35203

**ATTORNEYS FOR ALABAMA POWER COMPANY**

Edward S. Allen
C. Grady Moore, III
Spencer M. Taylor
Sean W. Shirley
Thomas L. Casey, III
Balch & Bingham, LLP
1710 Sixth Avenue North
P.O. Box 306
Birmingham, AL 35203-2015

**ATTORNEYS FOR STATE OF GEORGIA**

Bruce P. Brown
R. Todd Silliman
John C. Allen
McKenna Long & Aldridge, LLP
303 Peachtree Street, N.W.
Suite 5300
Atlanta, Georgia  30308

Thurbert E. Baker
Attorney General, State of Georgia
Robert S. Bomar, Deputy Attorney General
Isaac Byrd, Deputy Attorney General
40 Capital Square, S.W.
Atlanta, Georgia  30334-1300

**ATTORNEYS FOR WATER SUPPLY PROVIDERS**

Patricia T. Barmeyer
Lewis B. Jones
King & Spalding, LLP
1180 Peachtree St
Atlanta, GA 30309

**ATTORNEYS FOR GWINNETT COUNTY, GEORGIA**

William M. Droze
Gregory W. Blount
Natalie D. Sacha
Troutman Sanders LLP
Bank of America Plaza, Suite 5200
600 Peachtree St., N.E.
Suite 5200
Atlanta, GA 30308-2216

**ATTORNEYS FOR SOUTHEASTERN FEDERAL POWER CUSTOMERS**

Clinton A. Vince
Orlando E. Vidal
Julie A. Weisman
Sullivan & Worcester LLP
1666 K. St., N.W., Suite 700
Washington, DC 20006

**ATTORNEYS FOR CITY OF COLUMBUS, GEORGIA**

Lee A. DeHihns, III
Benjamin Lee Snowden
Alston & Bird LLP
1201 W. Peachtree Street N.W.
Atlanta, Georgia  30309

J. Barrington Vaught
Hatcher, Stubbs, Land, Hollis & Rothschild, LLP
6310-A Bradley Park Dr.
Columbus, Georgia 31904

**ATTORNEY FOR LAKE LANIER ASSOCIATION**

Clyde Y. Morris
Law Office of Clyde Y.  Morris
2375 Whippoorwill Lane
Gainesville, Georgia  30501

**ATTORNEYS FOR WATER WORKS AND SANITARY SEWER BOARD
OF THE CITY OF MONTGOMERY**

Robert E. Sasser
Charlanna Spencer
R. Brian Tipton
Mathew J. Bauer
Sasser, Littleton & Stidham, P.C.
One Commerce Street, Suite 700
P.O. Drawer 4539
Montgomery, Alabama  36102

Chad E. Stewart
Marsh, Cotter & Stewart LLP
203 East Lee Street
P.O. Box 310910
Enterprise, Alabama  36331

**ATTORNEYS FOR CITY OF APALACHICOLA, FLORIDA**

J. Patrick Floyd
Law Offices of J. Patrick Floyd, Chartered
408 Long Avenue
Port St. Joe, Florida  32456

**Edward S. Allen**
  eallen@baalch.com

**John C. Allen**
  jallen@mckennalong.com

**Haley A. Andres**
  handrews@lightfootlaw.com

**James T. Banks**
  jtbanks@hhlaw.com; nnbarefoot@hhlaw.com

**Natalie Barefoot**
  nnbarefoot@hhlaw.com

**Donald G. Blankenau**
  don.blankenau@huschblackwell.com

**Luca R. Bronzi**
  LRBronzi@hhlaw.com
  nmorales@hhlaw.com

**Bruce P. Brown**
  bbrown@mckennalong.com

**James A. Bryam, Jr.**
  jbryam@balch.com

**Thomas L.Casey,III**
  tcasey@balch.com;  jschober@balch.com

**William S. Cox, III**
   wcox@alwlaw.com,tammyw@lfwlaw.com

**Lee A.DeHihns, III**
  lee.dehihns@alson.com

**William M. Droze**
  william.droze@troutmansander.com; terri.griffin@troutmansander.com

**J. Patrick Floyd**
  j.patrickfloyd@jpatrickfloyd.com

**Lewis B. Jones**
  lbjones@kslaw.com; jfortuna@kslawa.com; abalderamos@kslaw.com;
  pbarmeyer@kslaw.com

**Nikaa Baugh Jordan**
  njordan@lfwlaw.com

**Joel M. Kuehnert**
  jkuehnert@bradleyarant.com, ksoppet@bradleyarant.com

**Matthew H. Lembke**
mlembke@bradleyarant.com

**James A. Maysonett**
  james.a.maysonett@usdoj.gov

**C. Grady Moore, III**
  gmoore@balch.com

**Clyde Y. Morris, Jr.**
  clydemorris@charter.net

**W. Larkin Radney, IV**
  lradney@lfwlaw.com

**Natalie D. Sacha**
  Natalie.sacha@troutmansanders.com

**Robert E. Sasser**
  rsasser@sasserlawfirm.com;rdumas@sasserlawfirm.com;
frank.taylor@atchisonlaw.com

**Sean W. Shirley**
  Shirley@balch.com; kepowell@balch.com

**R. Todd Silliman**
  tsilliman@mckennalong.com

**Benjamin Lee Snowden**
  ben.snowden@alston.com

**Ruth Ann Storey**
  ruth.ann.storey@usdoj.gov

**Spencer M. Taylor**
  staylor@balch.com

**Parker D. Thompson**
  pdthomson@hhlaw.com; gecata@hhlaw.com

**Orlando E. Vidal**
  ovidal@sonnenschein.com,                    cvince@sonnenschein.com,
  jaquiliana@sonnenschein.com,                ksealy@sonnenschein.com,
  nreeber@sonnenschein.com

**Thomas R. Wilmoth**
  twiloth@blackwellsanders.com


                              s/J. Patrick Floyd
                              **J. Patrick Floyd**
                              **Florida Bar No. 257001**
                              **Law Offices J. Patrick Floyd, Chtd.**
                              **408 Long Avenue**
                              **Port St. Joe, FL  32456**
                              **Tel.  (850) 227-7413**
                              **Fax. (850) 229-9196**
                              j.patrickfloyd@jpatrickfloyd.com

                              **Attorney for Plaintiff,  City of**

                              **Apalachicola**